**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Charles E. SELLERS, Jr., et al., Defendants-Appellants.**

**No. 72-3733.**

United States Court of Appeals, Fifth Circuit.

July 26, 1973.

Rehearing and Rehearing En Banc Denied Nov. 7, 1973.

Calvin M. Whitesell, William R. Gordon, Montgomery, Ala., for Sellers & Sexton.

Joseph D. Phelps, Philip H. Butler, Montgomery, Ala., for Carr.

Ira DeMent, U. S. Atty., D. Broward Segrest, David B. Byrne, Jr., Asst. U. S. Attys., Montgomery, Ala., for plaintiff-appellee.

Before GOLDBERG, CLARK and RONEY, Circuit Judges.

I. AFFIDAVIT FOR SEARCH WARRANT

STATE OF ALABAMA ⎱ SS.
COUNTY OF ELMORE ⎰

*Willie B. Painter,* affiant, being first duly sworn on oath, deposes and says:

CLARK, Circuit Judge:

Sellers, Sexton, and Carr appeal from their convictions for the use of a wire communication facility for the transmission in interstate commerce of wagering information in violation of 18 U.S.C. § 1084(a). We find no merit in any of the contentions raised on this appeal and therefore affirm the convictions.

### Validity of the Search Warrant

*The Unidentified Informer's Tip*—The appellants first urge that the warrant authorizing the search of the premises on which the gambling operations were conducted did not comply with the standards set out in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and further explicated in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). These cases hold that an affidavit based solely upon an unidentified informer's tip may provide the probable cause basis for the issuance of a search warrant if the affidavit contains sufficient objective assertions from which a detached magistrate may reasonably conclude that the hearsay should be credited. In these rulings the Supreme Court established a two-prong test for assaying affiants' hearsay statements: (1) the affidavit must present sufficient objective evidence to enable the magistrate to conclude that the unnamed informant is credible or that his information is reliable, and (2) the affidavit must set forth some underlying circumstances which reveal the source of the informer's information pertaining to the criminal activity.

The appellants here do not challenge the sufficiency of the instant affidavit[1]

(1) That the following property constitutes evidence of criminal conduct: In that the herein described automobiles and real property contains records and other evidence of transactions whereby money or other valuable things may be won or lost upon prize fights, ball games, or other contests or book-making or pool-selling, contrary to Title 14, Sec-

to meet prong (1)—the reliability of the unidentified informer. Rather, they contend that the affidavit in this case fails to satisfy prong (2)—the requirement that the warrant disclose the underlying circumstances from which the informant drew his conclusion of criminal activity so as to enable independent magisterial evaluation.

The face of the affidavit in the case at bar does not expressly state any source for the informer's information. The government, however, contends that a reading of the entire affidavit discloses sufficient detail to satisfy the alternative prong (2) standard enunciated in *Spinelli* because the affidavit describes the criminal activity "in sufficient detail that the magistrate may know he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation."

*Spinelli,* 393 U.S. at 416, 89 S.Ct. at 589.

Though appellants quarrel somewhat with the *Spinelli* premise that a sufficiently detailed affidavit may support the inference that the informant gained his information in a reliable way, their principal argument is that the affidavit in this case does not meet that standard. They contend that the affidavit here is little more detailed than the one found defective in *Spinelli* and that the objective facts set out do not support the requisite inference. We disagree. As did the affiant in *Spinelli*, the affiant here, Mr. Painter, asserted that two telephones were located on the premises to be searched and that an informer who had proven to be exceptionally reliable had stated that the suspects were operating a gambling enterprise. Unlike the affiant in *Spinelli*, however, Mr. Painter did not content himself with

tions 261 and 278, Code of Alabama 1940, as amended.

(2) Affiant further says that the above-mentioned property is located at the following described place: 243 Murphy Drive, a residence located in the Scenic Hills section, a residential area located in the Southwest section of Elmore County, Alabama, being the residence of Charles E. Sellers.

One 1971 Pontiac Grand Prix two door sedan, VIN 2765718171502, bearing 1972 Alabama Licence plate number 29–9109, issued to Charles E. Sellers, Route 5, Prattville, Alabama.

One 1968 Chrysler 300, two door sedan, VIN 3M23K86C201138, being 1972 Alabama License plate number 29–9110, issued to Charles E. Sellers, Route 5, Prattville, Alabama.

(3) Affiant further says that he has probable cause to believe the above-listed property to be searched for and seized is now located upon said described premises, based upon the following facts: Information is that Charles Sellers is operating book from his residence located at 243 Murphy Drive, Prattville, Alabama. He has two telephones listed from this residence as follows: #365–6461 and #365–8657. Information REFLECTS THAT #365–8657 is apparently used for the bookmaking operation.

Toll calls have been made from this number to telephone number 853–1252 in Birmingham frequently during recent months. Telephone number 853–1252 is in the name of Michael Canon, 1120 B. Florentine Circle, Birmingham, Alabama. This number is an unlisted number. Canon also has telephone service through #853–8751 and Canon is a known gambler.

Telephone number 322–6928 has been called frequently from Charles Sellers residence number. This number is in the name of Anthony Ippolito at 2646 Milner Court, Birmingham, Alabama. Ippolito also has #324–7195. Frequent calls have been made from telephone number 365–8657 to telephone number 853–8751 in Birmingham.

Information is that Canon and Ippolito are furnishing the line to Charles Sellers on basketball games at the present and on football and baseball games during the season. Sellers in turn furnishes the line to local bookmakers in the Montgomery area. Canon and Ippolito reportedly are handling layoffs for Charles Sellers.

The above information was supplied by an informant who has given reliable information in more than one hundred instances in matters of investigation.

a mere conclusory statement that the defendants were conducting a gambling operation. Instead, he went on to outline the administrative hierarchy of the bookmaking operation to the magistrate by swearing that he had been told that two of the individuals furnished "the line" to and "handled layoffs" for the third, and that the third individual disseminated "the line" locally. These detailed statements relating to the organizational procedures of the gambling operation provided a basis from which a detached judicial officer could reasonably infer that the informant must have had specific and direct knowledge of this particular bookmaking operation. In addition, Mr. Painter disclosed to the magistrate that he was advised that two telephones were maintained at each of two other specified addresses and that frequent long distance toll calls were made between all three addresses. He also stated that the telephone service at one of the addresses was in the name of Michael Canon, and opined that Canon was a known gambler. A magistrate could have reasonably inferred from his wealth of detail as to the inter-use of these telephones that the information was the product of the informer's personal knowledge or that the informer had access to and had examined telephone survey records.

 Moreover, common sense impells the conclusion that when a confidential informer is shown to be unusually reliable, the magistrate may place added credibility in such information in the affidavit as reveals the precise source of the informer's knowledge. The affidavit before us here recites that the informant had furnished reliable information on more than one hundred occasions.[2] In cases where the affidavit presents such cogent assertions of reliability the quantum of underlying circumstances which reveal the source of the informer's knowledge necessary to sustain the affidavit is clearly less than

in cases where the indicia of informer reliability is less dramatic. In sum, either of the two objective standards from which the magistrate is to judge the worth of the hearsay may support, although it may not displace, the other. *See* United States v. Crawford, 462 F.2d 597 (9th Cir. 1972); *cf.* United States v. Roth, 391 F.2d 507, 511 n.5 (7th Cir. 1967). While the instant case is both a unique and close one, on these facts we hold that the face of the affidavit properly permitted the magistrate to infer that sufficient probable cause was shown to justify the issuance of a search warrant.

> It is not the intent of the *Aguilar* and *Spinelli* decisions to make it difficult for a policeman to get a warrant if in fact he has probable cause. On the contrary, the cases contemplate that an affiant with some basic understanding of the law can get a warrant if he has probable cause and simply sits down and explains why. Accordingly, we have evaluated the warrants in this case not under technical requirements but against the benchmark cases that the Supreme Court has indicated we should use. In doing so, we have construed the preference for searches under warrants to imply that the benchmark cases are concerned with practical inferences that may be taken from the facts as a whole.

Gonzales v. Beto, 425 F.2d 963, 970 (5th Cir. 1970) (footnote omitted).

 *State Search Warrants and Federal Rule 41*—Relying on this court's recent opinion in United States v. Brouillette, 478 F.2d 1171 (5th Cir. 1973), which held that a warrant may be issued by a United States Commissioner to federal officers only upon a showing of probable cause to believe that a federal crime has been committed, the appellants mount a second, more technical, attack on the state court search warrant. They contend that the fruits of the search, conducted under authority of the warrant

---

2. As it turns out, the unnamed informant was a Special Agent of the Federal Bureau of Investigation.

issued by an Alabama judge on a probable cause showing of a breach of Alabama law, but not federal law, are not admissible in a federal prosecution. This somewhat startling contention is based on the premise that the federal involvement in this particular search made it equivalent to a federal search and thus subjected it to the technical requirements of Rule 41 of the Federal Rules of Criminal Procedure,[3] including the *Brouillette* requirement that the warrant only issue upon a showing sufficient to establish probable cause to belive a *federal crime* has been committed.

Despite the government's contention that the fact is otherwise, we assume for the purpose of this decision that there was sufficient federal involvement to require that the search be treated as a federal search.[4]

At the same time we note that there is no suggestion that the state participation in the search was not a bona fide effort to secure evidence of a violation of state law for use in a state prosecution.

In Navarro v. United States, 400 F.2d 315 (5th Cir. 1968) (hereinafter *Navarro I*),[5] this court held that the fruits of a search conducted jointly by federal and state officers pursuant to a state warrant were improperly admitted into evidence in a federal prosecution since the warrant was not issued by a "court of record" as then required by Rule 41.[6]

---

3. At the time of the issuance of the warrant the relevant portion of Rule 41 read as follows:

 *Rule 41.*
 *Search and Seizure*
 (a) Authority to Issue Warrant. A search warrant authorized by this rule may be issued by a judge of the United States or of a state, commonwealth or territorial court of record or by a United States commissioner or territorial court of record or by a United States commissioner within the district wherein the property sought is located.
 (b) Grounds for Issuance. A warrant may be issued under this rule to search for and seize any property
 (1) Stolen or embezzled in violation of the laws of United States; or
 (2) Designed or intended for use or which is or has been used as the means of committing a criminal offense; or
 (3) Possessed, controlled, or designed or intended for use or which is or has been used in violation of Title 18, U.S.C., § 957.
 (c) Issuance and Contents. A warrant shall issue only on affidavit sworn to before the judge or commissioner and establishing the grounds for issuing the warrant. If the judge or commissioner is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched. The warrant shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States. It shall state the grounds or probable cause for its issuance and the names of the persons whose affidavits have been taken in support thereof. It shall command the officer to search forthwith the person or place named for the property specified. The warrant shall direct that it be served in the daytime, but if the affidavits are positive that the property is on the person or in the place to be searched, the warrant may direct that it be served at any time. It shall designate the district judge or the commissioner to whom it shall be returned.

4. The proof discloses that the informant was an active federal official and that this informant and one other such official accompanied state officers to the premises and participated in certain phases of the search process. After a successful state prosecution based upon the evidence disclosed by the search, the instant federal charges were filed.

5. In United States v. Navarro, 429 F.2d 928 (5th Cir. 1970), however, this court held that the use in a subsequent state court prosecution of the physical evidence discovered by the state officers during the joint search should not be enjoined, though the federal officers were not allowed to testify as to the fruits of their search. Finally, in United States v. Navarro, 441 F.2d 409 (5th Cir. 1971), we held that an officer who was a state agent at the time of the search could testify as to the fruits of the search at the state trial despite the fact that he had subsequently accepted employment by the federal government.

6. The 1972 amendments to Rule 41, effective October 1, 1972, omit the court of record requirement.

The question presented here, where the search was conducted by federal and state officers under the authority of a warrant issued by a state court on the affidavit of a state officer which averred that evidence of a state crime might be found, is whether *Navarro I* requires the suppression of the fruits of that search in a federal prosecution because the warrant was not secured through procedures which complied in all respects with the requirements of Rule 41.

█ Properly read, Rule 41 grants the authority to designated judicial officers, federal and state, to issue federal search warrants. The authority granted to state courts under this rule is *in addition* to the state-vested power of those courts to issue a warrant upon a showing that probable cause exists to believe a violation of state law has occurred. While Rule 41 sets out the procedure to be followed in issuing a warrant for a violation of federal law, it obviously should not be contemplated that the federal rule would purport to regulate the procedures through which state courts may issue search warrants predicated on violations of state law.

██ A federal court reviewing the sufficiency of a warrant issued by a state court, for the purpose of determining whether the fruits of a resulting search are lawful and hence admissible in a federal prosecution, must determine whether the warrant was issued as a federal warrant or as a state warrant. If the warrant was issued under authority of Rule 41 as a federal warrant clearly it must comply with the requirements of the rule. If, however, the warrant was issued under authority of state law then every requirement of Rule 41 is not a *sine qua non* to federal court use of the fruits of a search predicated on the warrant, even though federal officials participated in its procuration or execution. The products of a search conducted under the authority of a validly issued state warrant are lawfully obtained for federal prosecutorial purposes if that warrant satisfies constitutional requirements and does not contravene any Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers.

*Navarro I* established that the "court of record" requirement of Rule 41 was a substantive standard by which the conduct of federal searches should be measured rather than any mere procedural standard. Our holding today must not be construed as a retreat from the principle of that case. It is, rather, a refusal to extend *Navarro I* beyond the limits of common sense.

The requirement of Rule 41 (before it was amended) that warrants be issued only by "courts of record" apparently reflected an intent that federal searches were not to be conducted on the authority of search warrants issued by state tribunals whose functions are so limited that they have not been made courts of record.[7] *Navarro I* accomplished this purpose, through the use of this court's supervisory power, by excluding from federal prosecutions the fruits of searches conducted with federal officers participation.

No such useful purpose could be served, however, by a declaration that state warrants must be issued only to investigate federal crimes if federal officers may be present when the search is conducted. In a case where sufficient evidence of any federal crime is lacking, as it was apparently lacking in the case *sub judice,* cooperating officials would be completely unable to comply with such a rule. The fault which the appellants urge us to declare could not be avoided by procuring the warrant from another court.[8] The only effect of such a requirement on the conduct of federal officers would be to preclude federal cooperation and participation in any warranted search conducted by state officers for state purposes. We decline to

---

7. See *Navarro I, supra,* 400 F.2d at 318 n. 2.

8. Compare *Navarro I.*

hold that such an anomalous and baseless rule was ever intended by Rule 41. *Navarro I* certainly intended no such result. To the contrary, it stated:

> We do not mean to suggest in any way that we would discourage cooperation between federal and state law enforcement officers.

400 F.2d at 319.[9]

■ The proper test to be applied is whether a particular Rule 41 standard is one designed to assure reasonableness on the part of federal officers, or whether the provision merely blueprints the procedure for issuance of federal warrants. The case *sub judice* presents a paradigm of the latter class of requirements. The federal crime essential of *Brouillette* is a recognition of the inherent limits of the authority granted by Rule 41 to federal and state magistrates to issue federal search warrants. It does not exist to limit the activities of federal officers when they cooperate with state officers. We decline to apply this particular Rule 41 requirement to state warrants. The contention that the fruits of this joint federal and state search should be suppressed is without merit.

■ Moreover, we specifically decline to adopt any rule under our supervisory power that would require that state court warrants meet all of the Rule 41 procedural requirements whenever federal officers have sufficient evidence of federal law violations to obtain a federal warrant.[10] Such a rule would not only serve no useful purpose, but it would also place officers acting jointly on the horns of a dilemma in deciding whether to charge a state or federal crime. Such officials should be free to make a considered choice based on the best available information and unencumbered by merely technical procedural rules.

#### *"Transmission" under the Statute*

■ Appellant Carr, conceding for the sake of argument that the evidence established that wagers were received by telephone from out-of-state betters, nevertheless contends that the government failed to establish a violation of 18 U.S. C. § 1084(a).[11] He bases this argument on his contention that "transmission" as used in that provision does not embrace the act of receiving. For this proposition he cites United States v. Stonehouse, 452 F.2d 455 (7th Cir. 1971), and Telephone News Systems, Inc. v. Illinois Bell Telephone Co., 220 F.Supp. 621 (N. D.Ill.1963) (three judge court) (dicta), aff'd per curiam, 376 U.S. 782, 84 S.Ct. 1134, 12 L.Ed.2d 83 (1964), both of which lend some support to his contention. In Sagansky v. United States, 358 F.2d 195, cert. denied, 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966), however the First Circuit reached a contrary result.

While this might be a proper construction of the term "transmission" taken out of context, § 1084(a) does not punish the mere transmission of bets or wagers, but rather the "use" of interstate wire communication facilities for their transmission. When

---

9. *Brouillette* also recognized the necessity of federal-state co-adjuvancy.
 After all, under the system of federalism, there is room for dual state-federal activity. Federal officials often refer information they have received to state officials for possible prosecution.
 478 F.2d at 1177.

10. Though some of the testimony in this case indicates that the federal officers suspected a violation of federal law, we are unable to determine from the record before us whether the officers had sufficient evidence to have secured a federal warrant.

11. Whoever being engaged in the business of betting or wagering knowingly uses a wire communicaion facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

a person holds himself out as being willing to make bets or wagers over interstate telephone facilities, and does in fact accept offers of bets or wagers over the telephone as part of his business, we think it is consistent with both the language and the purpose of the statute to hold that he has "used" the facility for the transmission of bets or wagers.

358 F.2d at 200. The First Circuit's interpretation has recently found favor in the Tenth Circuit, which gave the statute a similar reading in United States v. Tomeo, 10 Cir., 459 F.2d 445, cert. denied, 409 U.S. 232, 93 S.Ct. 232, 34 L. Ed.2d 175 (1972).

In reaching this conclusion we give consideration . . . to the fact that the telephone is designed for a two-way conversation and exchange of information. If we were to accept the appellant's contention, we would effectively deny that any discussion or exchange took place, and we find that assumption rather strained. We also note that an interpretation of use of the wire facility which is limited to the isolated *sending* of messages does not meet the basic purpose of the statute and renders its scope more limited than an everyday experience with the telephone would dictate. The statute deals with bookmakers—persons "engaged in the business of betting or wagering." Bookies *take* bets, they receive them, they handle them; it is a transaction requiring mutuality or a meeting of minds. It is unlikely in framing section 1084(a) that Congress considered betting transactions to move in but one direction in the use of the telephone.

459 F.2d at 447. Aligning ourselves with the views of the First and Tenth Circuits, we conclude that the statute properly construed reaches the activities of these professional gamblers who, as the jury found, conducted their activities through the use of interstate telephone facilities, regardless of which party sent and which received the wager.

*Sufficiency of the Evidence as to Carr*

Next, Carr contends that, even if the evidence was sufficient to support a jury finding of his involvement in an intrastate gambling operation, the government failed to show that he personally knew of the interstate character of the enterprise. The contention is not well taken.

The proof in this case was overwhelming that telephone calls were received from an out-of-state bettor. Moreover, if the statute requires actual knowledge of the non-local origin of such telephone transmissions,[12] it is clear that at least one or more of the participants in the enterprise knew that calls were received from Kosciusko, Mississippi. It was not necessary that the Government prove that Carr had actual intent to violate federal law, in light of the more-than-sufficient proof that he aided and abetted the state law violation.

There must exist a community of unlawful intent between the accessory and the perpetrator of the crime, but "* * * an accessory is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him." 22 C.J. S., Criminal Law, § 92, p. 164.

Russell v. United States, 222 F.2d 197, 199 (5th Cir. 1955); McClanahan v. United States, 230 F.2d 919, 924 (5th Cir.), cert. denied, 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47 (1956). *See also* United States v. DeLaMotte, 434 F.2d 289 (2d Cir. 1970), cert. denied, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

Carr's reliance on Grimes v. United States, 379 F.2d 791 (5th Cir.), cert. denied, 389 U.S. 846, 88 S.Ct. 104, 19 L. Ed. 113 (1967), is misplaced. In that

12. *Compare* United States v. Swank, 441 F.2d 264 (9th Cir. 1971).

case the aiding and abetting conviction was reversed, not for lack of knowledge that a gambling associate had traveled interstate, but expressly because the proof did not show Grimes had counselled or assisted that activity. Reading that case with this court's opinions in *Russell* and *McClanahan,* as we must, it is apparent that the interstate activity proven in *Grimes* was implicitly held not to be a natural or probable result of Grimes' participation in the illegal local gambling operation. In the case at hand, Carr is bound to have known that it was most natural and highly probable that an operation of this magnitude would receive at least one interstate call.

### The Unabridged and Unexpurgated Tapes

 Finally, the appellants urge reversal on the ground that during its deliberations the jury was improperly permitted to listen to certain recorded tapes, only portions of which had been admitted into evidence. After determining that at least some members of the jury had listened to substantial portions of the tapes which were not properly before them, the trial judge denied the appellant's motion for a mistrial, finding that appellants had suffered no prejudice and that the error, if any, was the fault of appellants' trial counsel.

 The trial judge, through the bailiff, specifically advised the attorneys for each of the defendants and the Government that it was their responsibility to review the exhibits that had been placed in the hands of the clerk for the purpose of seeing that no exhibits not admitted into evidence went to the jury. Though appellants apparently recognize that ordinarily a failure of counsel to comply with such an order would provide them with no basis for objection, *see* Dallago v. United States, 138 U.S. App.D.C. 276, 427 F.2d 546, 554 (1969), and United States v. Strassman, 241 F. 2d 784, 786 (2nd Cir. 1957), they argue on this appeal that they were misled by the statements of the Government attorney. As the transcript of the trial

court's inquiry into this question reveals, one of the attorneys for the appellants stated to the Government attorney that he was concerned about the tapes going to the jury room. The Government attorney responded that although the entire tape had been placed in the recorder, it was set so that the portion of tape that had been admitted into evidence would play when the machine was turned on. The counsel for the appellants acquiesed in this procedure, and the tapes were sent to the jury. Some one and a half hours later and before any further word had been received from the jury the defendants' attorney, apparently regretting after reflection his initial decision to furnish the tapes to the jury in this manner, brought the matter to the attention of the court. The court stated that he would inquire of the jury when they returned a verdict as to whether they had listened to any unadmitted portions of the tapes.

We need not reach or decide whether the Government's representations were so misleading as to free the defendants of the consequences of their lawyer's choice, because we determine that no prejudice resulted from the jury's exposure to the unadmitted portions of the tapes. Sellers and Sexton did not contest the fact that they operated a bookmaking enterprise, while the evidence as to Carr's participation was overwhelming. The only really contradicted issue at trial was whether the appellants used the telephone in interstate commerce. In its order denying the motions for a new trial, the district court stated:

> This court has very carefully listened to the tape recordings in question and finds that, in addition to some "family talk" and singing and pop music, there is general talk by unidentified men regarding betting, the recording of sports scores from short-wave radio, the giving of betting lines on basketball games, and a discussion by two unidentified men in which Charles Carr's name is mentioned with reference to a land transaction in Crenshaw County, Alabama. Thus, this

court specifically finds that none of the defendants were prejudiced to any degree by the tape recordings in question going to the jury.

After listening to these two tapes, we can reach no other conclusion except that any error was harmless beyond a reasonable doubt. *See* Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L. Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed. 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967).[13]

We have considered the other issues raised by the appellants and find them without merit. The convictions appealed from are

Affirmed.

13. In light of this holding that any error was harmless, we need voice no opinion as to whether, when a motion to retrieve the tapes had been properly presented, the trial judge would have committed error if he had not taken immediate action to retrieve the tapes. It is possible that such action would have prevented what ultimately transpired in the jury room; on the other hand, it might well have only emphasized to the jury that certain evidence, probably unfavorable to the defendants, was being withdrawn from their consideration. No contemporaneous recording was made of the colloquy between counsel and the trial judge as to this matter. However, it appears that defense counsel acquiesced in the trial court's suggestion that no action be taken pending the jury verdict.