UNITED STATES of America, Plaintiff,

v.

Jimmie BENFORD, Defendant.

Crim. A. No. 8-80244.

United States District Court,
E. D. Michigan, S. D.

July 27, 1978.

On Motion to Prevent Spouse From
Testifying Sept. 12, 1978.

Ellen Dennis, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

John W. Tapp, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

The motion to suppress in this case deals with a problem of great importance. That problem is the kind of cooperation that can legitimately exist between local and national law enforcement agencies to enforce the laws under which each of our citizens live.

### Findings Relative to the Searches

This is a prosecution for a felon in possession of a firearm, a federal crime. A motion to suppress the results of a search required an evidential hearing that showed the following events to have taken place:

1. A woman came to the Detroit Police with a complaint of having been beaten by her husband with a pistol.

2. Federal Alcohol, Tax and Firearm officers happened to be present and became interested in the firearm, having knowledge that her husband had earlier been convicted of a felony.

3. During the course of detailing her story, she suggested that she believed her husband had other firearms in the house, perhaps even a submachine gun.

4. The evidence as to the existence of the other guns was of quite a different character than the evidence of the handgun, which was claimed to be the object causing the injury to the woman. The court does not believe that a magistrate could find or would have found probable cause as to the other guns based on the evidence available to the officers at the time of the first application.

5. The local police, with the federal agents assisting, presented a request for a search warrant to a state judge who came to the police station to examine the affidavits, it being 11:00 p.m., and who issued the warrant authorizing a search for a brown handled handgun.

6. Some time later, after both local officers and federal ATF agents had maintained surveillance of the defendant's house for approximately 18 hours and after an arrest warrant had been issued for the defendant for the assault and battery on the woman, the defendant was arrested.

7. After the defendant was arrested, he was informed of the search warrant and, to avoid breaking down the door, he gave up his keys and the search warrant was executed.

8. A half dozen or so state and local officers were present at the execution of the search warrant. Also present were ATF agents. The warrant was executed by the state and local officers.

9. The first act of the officers upon entry of the house was to secure the house to make certain that no one was present who could be a danger to the search or to those conducting the search. This required looking into each room and behind each door. One of the first doors opened in securing the premises was a closet in the hall in which a local officer found a number of long guns and other guns. In addition, a large amount of stereo equipment and other duplicate personal property was noted in the house. The actions of the officers in securing the house appear to the court to be reasonable.

10. After the house was secure, the search began for the brown handled revolver. It was found by a local officer under a davenport when the davenport was lifted by a federal agent so the local officer could look under it.

11. Thereafter, the local officers examined and listed the guns seen in the closet and the stereo equipment.

12. The federal agents were in doubt as to how to proceed legally and called their general counsel in Cincinnati for advice. They were told that if the state agents were going to apply for a warrant to seize the stereo equipment, they should add a paragraph to the affidavit and to the warrant about the guns in the closet.

13. A state officer signed an affidavit and made a request for the warrant to permit seizure of the stereo equipment and the guns found in the closet.

14. The warrant was issued by a state judge.

15. Thereafter, the stereo equipment and the guns were seized and inventoried by the state officers, and the guns were turned over to the federal ATF agents.

16. The brown handled revolver was released later that day to the federal officials.

17. Both search warrants listed articles to be seized in which state officials had a legitimate interest by virtue of their duty to enforce state laws.

*Issues*

One issue posed by the motion to quash the search is how two agencies, one state and one national, each charged with enforcing the law, can legally obtain and execute search warrants for things that are legitimate objects of search and seizure. This issue squarely frames the problem of how our society can make federalism work without infringing upon the citizen's constitutional right to the reasonable expectation of privacy. A second issue involves the question of whether the officers, regardless of whether they were federal or state, should have included the information about the other guns in the request for the first warrant.

*Federal-State Cooperation*

This court begins its consideration of this issue with the following premises in mind and with the belief that they are sound:

1. The law must not only permit but encourage officers who are engaged in law enforcement work to cooperate to achieve their common goals of enforcing the law and thereby protecting the citizens of the state and nation. This cooperation must exist among state and local officers, as well as between state and local officers on one hand and federal officials on the other.

2. Both the state and the national government have an interest in providing rules for the behavior of persons charged with enforcing their laws that sometimes overlap and sometimes parallel each other. In particular, the state legislatures and state courts on the one hand and the federal congress and the federal courts on the other hand, each have an interest in specifying how officers that execute their search warrants must behave in the execution of these warrants.

3. Each level of government, of course, has the right to develop and establish additional rules of conduct that control the activities of its officers in the execution of their duties. A violation of these rules by the appropriate officer may have the effect of making the search illegal.

4. None of the officers, state or national, in the pursuit of their activities should violate the Constitution. If they do, the fruits of the search should be suppressed.

■ In this case, the state has laws against assault and battery. A state has a significant interest in enforcing these laws, and when a battered woman comes to a state or local police official telling a story of having been battered by a man with a brown handled revolver the state has an interest in searching for that gun. The fact that federal officials also have an interest, as a result of the Federal Felon in Possession of a Firearm statute, in no way lessens the state interest. The fact that federal officials assist in the investigation does not make a state officer's application to a state judge for a state search warrant and its issuance into a federal warrant. The fact that federal officials may have grounds for applying for a federal warrant, but do not, does not change a state warrant to search for specified objects relevant to a state crime into a federal warrant.

The first warrant issued in this case was for a brown handled handgun, the subject of legitimate state interest, issued pursuant to an application by a state official and issued by a state magistrate. This warrant was a valid state warrant.

The next contention on the part of the defendant is that the activity of the federal officials in participating in the search somehow violates the Constitution and thus requires the results of the search to be suppressed. Before this contention can be answered, the vices in such participation and cooperation and the rights to be protected must be identified. Rules to encourage those in charge of law enforcement to cooperate with one another to avoid duplication and to the full enforcement of the laws of both state and national governments should be adopted only to the extent that the rights of persons are not diminished by such cooperative activity. It seems clear that if the federal officers had not been present and the local police had seen the guns, as they did in this case, they should be encouraged to do something, perhaps call the fed-

eral officials and tell them so that the federal officials could get a warrant to seize them.

The fact that federal officers were present and saw the guns before the second warrant was issued impinges on the rights of the individual no more than if they had been state or local officers. But it is argued that they should have applied for a federal warrant under Rule 41 of the Federal Rules of Criminal Procedure, instead of riding on the coattails of the state warrant. This would have required (1) a separate application by the federal agents, (2) the warrant to have described a limited period of time within which the warrant could be executed, (3) an identification of a federal magistrate before whom the warrant could be returned, and (4) the warrant to be directed to a federal agent to execute it.

In this case the state officer applied for the second warrant and the warrant was issued as a state warrant for the seizure of what appeared to be stolen property, a state crime. In addition, the warrant also permitted the seizure of guns possessed by a person known to be a convicted felon, a federal crime.

The bottom line of the problem presented here is whether it is appropriate to search pursuant to a state warrant issued in the normal course of events for evidence of a state crime, stolen property, and also to search for other items named in the warrant which only violate federal law or whether the law should require duplicate warrant acquiring activity on the part of the federal officer. In this case, the same affidavit used in connection with the application for the state warrant could have been used. The same judge could have issued it, presumably he would have done so because he had found probable cause in connection with the issuance of the state warrant. The federal warrant would be on the federal form. It must be served within ten days, in the day time, and must designate a federal magistrate to whom it must be returned. This warrant was executed within ten days, in the day time, and there is no contention made that a federal magistrate would do more or less than the state magistrate did in connection with its return. The only real difference would be that the federal agents would seize the guns, rather than the state or local police who then turned them over to the federal agents.

This court cannot see how the right of any individual is in any way prejudiced by the procedures used in comparison with the procedures the defendant contends should have been used. This court believes that to grant the motion would be to glorify form over substance because no substantive difference can be found between what happened and the procedures the defendant sets forth as being appropriate. Therefore, unless compelled by law to suppress the return of the warrant, this court will refuse to do so because it seems that the kind of cooperation that has taken place in this case should be encouraged rather than stifled.

Modern cases that have dealt with this problem do not compel suppression of the fruits of the search under either warrant [*United States v. Sellers,* 483 F.2d 37 (5th Cir. 1973); *United States v. Burke,* 517 F.2d 377 (2d Cir. 1975)], but more importantly a correct analysis of the problem in context with the history of the development of the law surrounding the Fourth Amendment leads clearly to the result that the search should not be quashed.

In 1914 the Supreme Court held that in federal criminal prosecutions, evidence obtained by federal agents in violation of the defendant's Fourth Amendment rights must be suppressed and may not be received as evidence in the case. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). *Weeks* also permitted the reception in the federal criminal case of evidence illegally seized by local officers on their own behalf.

It is not surprising that such a result encouraged cooperation between state and local law enforcement officials, but it also was the spawning ground for great abuse. Since that time the Supreme Court has been attempting to deal with that abuse and yet avoid inhibiting necessary cooperative activity.

Twelve years later, *Byars v. United States,* 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1926), was decided. *Byars* held that in a joint search when the federal agent was "under color of his federal office", any evidence seized must be excluded if the search and seizure violated the Fourth Amendment because the joint activity had the same effect as if it were undertaken exclusively by the federal officer.

*Gambino v. United States,* 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927), amplified this holding by pointing out that unless the state officers had some legitimate state objective in conducting a search, their activity purely to investigate a federal crime would result in the exclusion of the evidence seized, if seized contrary to the Constitution.

Up to 1949, the law had developed to the point summarized by the Supreme Court as follows in *Elkins v. United States,* 364 U.S. 206, 212, 80 S.Ct. 1437, 1441, 4 L.Ed.2d 1669 (1960):

". . . Evidence which had been seized by federal officers in violation of the Fourth Amendment could not be used in a federal criminal prosecution. Evidence which had been obtained by state agents in an unreasonable search and seizure was admissible, because, as *Weeks* had pointed out, the Fourth Amendment was not 'directed to' the 'misconduct of such officials.' But if federal agents had participated in an unreasonable search and seizure by state officers, or if the state officers had acted solely on behalf of the United States, the evidence was not admissible in a federal prosecution."

In 1949, the Supreme Court decided *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). In that case, the Court held that the due process clause of the Fourteenth Amendment does not require a state to exclude evidence illegally seized.

The next step in the development of rules and strategies relating to intergovernmental police cooperation came in *Elkins v. United States, supra.* The Court pointed out that *Wolf v. Colorado, supra,* had undercut the premises permitting the federal officer to use the results of an illegal state search:

"The foundation upon which the admissibility of state-seized evidence in a federal trial originally rested—that unreasonable state searches did not violate the Federal Constitution—thus disappeared in 1949." (364 U.S. p. 213, 80 S.Ct. p. 1442).

The Court also said:

". . . The security of one's privacy against arbitrary intrusion by the police . . . is . . . implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause." (p. 213, 80 S.Ct. p. 1442).

The underlying holding in *Elkins* was that since the Constitution proscribes both federal and state searches without a warrant, there is no longer any reason to permit state officers to hand evidence seized illegally to federal officers on a silver platter. Thus all evidence seized contrary to the requirements of the Constitution would be kept out of a federal criminal prosecution.

The final chapter in the drama was written in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), when the Court held that evidence seized contrary to the Constitution would not be admissible in a state trial.

Since *Mapp,* the constitutional evidence rule pertaining to state searches and federal searches has been essentially the same. Since the officers of both federal and state and local police agencies are fundamentally now all bound by the same underlying constitutional rule aimed at the "security of one's privacy against arbitrary intrusion of the police", the essential part of the spawning ground for abuse of cooperation between state and federal investigative agencies has disappeared. Searches by one agency that will produce admissible evidence are essentially similar to searches by any other agency that will produce admissible evidence. Activity in connection with searches that are illegal will produce the

same result whether the prosecution is in a state or federal court. A federal agency does not gain an advantage in connection with the admissibility of evidence from a search by a state or local officer instead of a federal agent, and a state does not gain such an advantage by using federal agents. The climate for full cooperation in connection with searches is now complete and the courts should not continue to look askance each time such cooperation takes place.

The federal rulemakers have recognized the need for cooperation by permitting federal officers to apply to state magistrates for search warrants. F.R.Crim.P. 41.

In light of the history and development of the law surrounding the Fourth Amendment, the court finds that the kind of cooperation that existed in this case does not offend the law in the form of either rule, statute or Constitution.

■ The two leading cases on the subject, *United States v. Sellers,* 483 F.2d 37 (5th Cir. 1973), and *United States v. Burke,* 517 F.2d 377 (2d Cir. 1975), use different reasoning processes in attempting to resolve the problem posed in this case and the processes used by each is different from that suggested by this court. The court believes, however, that under the findings in this case each of those cases would support the conclusion reached here. The court respectfully, however, believes that to become bogged down in the morass of attempting to classify a search as a federal search or a state search is not helpful, and that the thrust of the inquiry should be directed to whether either federal or state officers violated the Constitution in the course of the search. If the warrant is applied for and obtained by state officers, any special state rules pertaining to its execution should apply insofar as they are not contrary to the Constitution. If the warrant is applied for and obtained by federal officers, the special rules pertaining to its execution found in Rule 41 should apply.

*Adequacy of the First Warrant*

■ The second ground for the motion deals with the issue of whether the officers should have obtained a warrant to search for the guns, other than the brown handled handgun, at the time of the application for the first warrant.

It is contended that *United States v. Sanchez,* 509 F.2d 886 (6th Cir. 1975), is controlling. In that case, the court affirmed a trial judge's suppression of explosives seized by ATF agents while accompanying a state officer in the process of executing a state search warrant for narcotics. The state narcotic agents, on learning of the presence of explosives in the house, notified the federal ATF agents to join them in their raid so as to be available to handle the explosives. The appellate court points out that the ATF agents had probable cause to search for the explosives for two hours before the execution of the warrant, and that the opportunity to get a federal warrant and probable cause for its issuance made the acts of the federal officers in searching for the explosives illegal. Because a federal warrant could have been obtained before the search, the essence of the case was that the federal search for the explosives could not be upheld if the warrant requirement was to mean anything.

This case is different than *Sanchez.*

1. The federal agents in this case were as interested in and had the legal right to be interested in the brown handled handgun, the subject of the first state search warrant, as were the local police.

2. The magistrate probably would not have issued a search warrant for other guns on the information available to the agents at the time the state warrant for the brown handled handgun was issued or executed.

3. The execution of the first warrant was a state operation involving first securing the premises and then a search for the gun.

4. The other guns were discovered as the house was being secured and before the search began and before the brown handled handgun was discovered.

5. On discovery of the other guns, a magistrate was again officially informed,

and based upon this additional information he issued a second warrant for the seizure of the other guns.

In this case, the officers acted in a way to protect the rights of citizens, officially advising a magistrate as they proceeded and acquiring additional authority as additional information became available. There were not two different and distinct intrusions in this case as there were in *Sanchez*—one by the state officials looking for narcotics and the other by the ATF agents looking for explosives. In this case, the agents were initially zeroing in on the brown handled handgun, a valid subject for state or federal search, for which a valid warrant had been obtained by state officers from a state magistrate. The federal officer did not broaden the intrusion by being along, or by failing to obtain a federal warrant.

For all of the reasons stated in this memorandum opinion and order, the motion to suppress is denied.

So ordered.

### ON MOTION TO PREVENT SPOUSE FROM TESTIFYING

Defendant has moved for a determination by the court so as to prevent the defendant's spouse from testifying. The facts of this case present issues that have received little attention by the courts.

Jimmie Benford was charged with illegal receipt and possession of firearms under Title 18, §§ 922(h)(1), 924(a), and [U.S.C. App.] 1202(a)(1), of the United States Code. The firearms were found in a house which he purchased for his wife and himself. He lived there for several months with his wife, at which time he was sentenced to prison. He was released some six months later and returned to his home. About four months later, pursuant to a search warrant, his house was searched and the guns were seized and he was charged with their possession.

The seizure came about after defendant's wife appeared at a local police station and complained of being battered by the defendant using a brown handled revolver.

Before the trial the government indicated that it desired to call the wife to the stand to give evidence as to defendant's possession of the guns. At that time, *in limine*, the court ruled that Proposed Rule 5.05, to the effect that an accused in a criminal proceeding has a privilege to prevent his spouse from testifying against him, fairly stated the privilege rule as it may be developed "by the principles of common law as they may be interpreted by the courts of the United States in the light of reason and experience." Federal Evidence Rule 501. The court indicated that, if the government attempted to call the defendant's wife, an objection to her testimony based on privilege would be sustained. When the government attempted to call the defendant's wife as a witness in its case in chief, the defendant claimed his marital privilege and she, although willing to testify, was not permitted to do so.

Later in the trial, the defendant chose to take the witness stand on his own behalf. The government had produced evidence sufficient to support a jury finding that the guns in question were found in a house at one time occupied and, at the time of finding the guns, owned by the defendant. Some of the guns were found in a closet and the others were found underneath a sofa. Based on an offer of proof of counsel as to defendant's testimony made outside the presence of the jury, the defendant planned to testify that he had not been at the house very much during the time that the guns were there. More specifically, he planned to testify: (1) that he did not use the closet in question; (2) that he never had any reason or occasion to look under the sofa; and (3) that at some times there was another man living in the house. The importance of this testimony is that it could create a doubt in the minds of the jurors as to whether the defendant received, possessed, or even knew of the existence of the guns.

Before this testimony was put before the jury, the court was asked to determine what effect if any his testifying as to these matters would have on the previously

claimed marital privilege. In an offer of proof, the government attorney stated that if Mrs. Benford were allowed to testify, she would contradict the exculpatory statements of her husband.

The privilege to prevent one's spouse from testifying is a leftover from the ancient common law disqualification of interested witnesses. 8 Wigmore, *Evidence* § 2227 (McNaughton Rev.1961). While commentators have criticized the continued viability of the privilege, there is no question but that the majority of courts still allow its exercise and in some form it is a part of the law of the United States. *Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); cases cited at Wigmore, *supra* § 2228 note 8. See also, Proposed Federal Rule of Evidence 5.05.

The case at bar presents an interesting opportunity to explore the outer reaches of the privilege as it exists today. The question for the court to decide is whether the marital privilege would be waived, in part or in whole, by the statements the defendant would have made to the jury. For the reasons stated in this opinion, the court believes that there would be a waiver. This is not an area of law which has been the subject of much litigation.

The facts indicate that the wife is in a unique position to confirm or contradict the defendant's claims. If the jury is not permitted to hear the wife's version of the facts, they may be misled into believing that no such testimony exists. On the other hand, if the wife is allowed to testify, the marital privilege will be undercut. The court is called upon to choose one or the other of the alternatives or to find a satisfactory middle ground.

The marital privilege is based on a desire to preserve domestic tranquility and, where that is not possible, to prevent a further marital breakdown. *Hawkins v. United States, supra.*

The court recognizes that testimonial privileges, by their very nature, keep relevant and probative evidence from the jury. Because of this, their exercise should be limited to those situations in which the sought after benefit to the privileged party legitimately outweighs the cost to society in terms of judicial inefficiency. The court should not lightly cast aside the benefits that one is entitled to from the exercise of the privilege, but in the rare case in which that benefit is clearly outweighed by the cost involved, the privilege should not be unfairly extended.

This is such a case. When the defendant first exercised his privilege, during the government's case in chief, he was fully entitled to do so. In fact, it is at this point in the trial that most issues involving the marital privilege are raised. The decided cases involve this initial claim of privilege and do not discuss the problem presented here which is the effect of the effort of the defendant to testify on the claim of privilege. However, when the defendant attempted to take advantage of his wife's forced silence by testifying to things known only to himself and to her, he attempted to use the privilege for a purpose it was never meant to cover. The court indicated that if the wife were willing to testify she would be permitted to testify as to matters directly involved in his testimony.

The defendant claims that he is denied the right to testify by this ruling. While a defendant by this ruling must choose between waiving the privilege by testifying as to facts about which he has knowledge and not testifying at all on these facts, this is not a denial of any right of the defendant. A defendant may not be forced to choose between two constitutionally protected rights, *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), but the marital privilege has no basis in the Constitution and its existence is not related to the criminal process. *Hawkins v. United States, supra.* This is one situation where the defendant being fully advised may be forced to make a choice.

Privileges may be waived by express action or waiver may be implied from the action of the holder of the privilege. Wigmore, *supra* at § 2242. Communication

privileges are waived by disclosure of the ·communication. *Id.* at § 2327.

■ This aspect of the marital privilege does not deal with privileged communications but the privilege to prevent testimony. This kind of privilege also can be waived. The draft of Proposed Rule 511 states the law to be: "A person upon whom these rules confer a privilege against disclosure of the confidential matter or communication waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication." This court believes this draft fairly states the existing law on the subject.

Because the waiver applies to privileged matter as well as communications, the waiver rule applies to testimonial privileges as well as communications privileges.

■ This case is analogous to those dealing with evidence of the defendant's character. The general rule is that the government may not introduce evidence to show a defendant's bad character. However, once the defendant chooses to introduce evidence of his good character, he has impliedly waived his rights under the general rule and opened the door to rebuttal by the government. *United States v. Walker,* 313 F.2d 236 (6th Cir.), *cert. denied* 374 U.S. 807, 83 S.Ct. 1695, 10 L.Ed.2d 1031 (1963). In this case, there is no doubt about the defendant's power to exercise the privilege if he so chooses, but as indicated he does have the ability to waive that power either expressly or impliedly. The giving of evidence of facts within the wife's knowledge should be and is an implied waiver.

■ Here, the defendant, if he were to testify, would be opening the door to a probing of the incidents he discusses. In so doing, he waives his marital privilege surrounding the substance of his testimony. *United States v. Burkhart,* 501 F.2d 993 (6th Cir. 1974); *United States v. Smith,* 533 F.2d 1077 (8th Cir. 1976); *People v. Berrier,* 48 Mich.App. 454, 210 N.W.2d 506 (1973). This is not a total waiver, for the court must keep in mind that the privilege does

exist, and any waiver should be limited to that part of the wife's potential testimony which deals directly with the events testified to by the defendant. The court also notes that there is one further area of middle ground that might be used to protect the defendant but is not presented by the facts of this case.

■ In this case the wife is willing to testify. The testimony of a willing wife who has filed the original complaint against her husband is hardly likely to do more to upset a marital relationship than already has been done. If the desire to preserve domestic tranquility is a valid reason for the privilege, the voluntary testimony of the wife after the door is opened by the husband by his testimony seems to the court not to be a significant part of upsetting domestic tranquility. If, however, the testimony of the wife was not voluntary, perhaps a different result should be reached. In a sense, then, it appears to the court that the marital privilege on re-examination should be double handled requiring a waiver by each party before the testimony could be received. In this case there would be such a waiver, the offer of testimony by the husband and the voluntary act by the wife.

■ The rule applied by this court is that whenever a defendant chooses to take the stand on his own behalf, he waives the marital privilege so far as it covers the wife's testimony affirming or contradicting the defendant's, when the wife is in a unique position to know the facts involved and she may testify about those facts if she chooses to do so.

So ordered.