OPINION OF THE COURT
Chief Judge Cooke.
 The marital privilege may protect from discovery a tape recording left to one spouse by the other, even though the tape apparently was prepared in contemplation of suicide. Having attached, the marital privilege also precludes examining the tape for deletions or erasures. In addition, a tape recording having left the maker’s possession, but which is regained without disclosure of its contents and delivered to the maker’s attorney in order to obtain legal advice, is protected by a combination of the Fifth Amendment privilege against self incrimination and the attorney-client privilege.
BACKGROUND
Late on December 31, 1981, Clara Vanderbilt told an acquaintance that her friend Dr. Richard Rosen had requested that she meet him at his office at Montefiore Hospital, where they both worked. A short time later, Vanderbilt was found outside Dr. Rosen’s office, unconscious from a severe bludgeoning about the head. Extensive surgery succeeded in preventing her death.
By January 3, 1982, Rosen knew he was a target of the assault investigation. On that day, he visited Vanderbilt at the hospital and learned that she had received a favorable prognosis. Rosen went to his office, made a tape recording at his desk, and then left the hospital. That evening, he attempted suicide at his house. Lifesaving emergency care was given to him at White Plains Hospital.
*71 After accompanying her husband to the hospital, Barbara Rosen returned to their home in the late evening of January 3. In the study, she found a cassette tape addressed to “Barbara” (“Tape No. 1”). Mrs. Rosen did not listen to the cassette, however.
The next day, January 4, Mrs. Rosen spoke to Arthur Olick, a neighbor and close friend of the Rosens who is an attorney. At this time, Dr. Rosen was still hospitalized and unconscious. After the wife related all the recent events, Olick expressed the need to retain counsel for Dr. Rosen and advised Mrs. Rosen to act for her husband. Mrs. Rosen told Olick of the tape she had found in the study and that she wanted to throw it away because of her aversion to listening to it. Olick instructed her to give the tape to him instead, to answer truthfully any questions about its existence, and to refer all inquiries to him.
Olick also suggested that Dr. Rosen’s hospital office be examined for any other notes or tapes. Mrs. Rosen telephoned her husband’s superior and requested that he look for such articles. A second cassette then was retrieved from Dr. Rosen’s desk and delivered to Mrs. Rosen (“Tape No.. 2”). Mrs. Rosen wrapped both cassettes and left them in Olick’s mailbox on the afternoon of January 4.
After the doctor regained consciousness, he hired Jonathon Rosner to represent him. Mrs. Rosen took the still-sealed tapes from Olick and delivered them to Rosner by handing them to Rosner’s 15-year-old son.
In the course of the police investigation, Mrs. Rosen voluntarily revealed the existence of Tape No. 1 and Rosner’s possession of it. Rosner refused to comply either with a Grand Jury subpoena duces tecum seeking the tape or with an ex parte court order directing that the tape be surrendered under seal to the court for the purpose of protecting the tape’s integrity. At a hearing on January 27, on an order to show cause and on a motion to quash the subpoena, Rosner admitted the existence and his possession of Tape No. 2. The court declined to rule whether the claimed privileges — attorney-client, marital, and that against self incrimination — protected the two tapes from discovery by subpoena. Instead, the court found Rosner to *72 be in contempt, but allowed him until the morning of January 29 to deliver the tapes to the court for safekeeping.
On January 28, Rosner and an Assistant District Attorney stipulated before a single Appellate Division Justice that the tapes would be surrendered to Supreme Court as ordered, but under seal. This was done on January 29. On the same day, a subpoena duces tecum was also served on Rosner for Tape No. 2.
On February 1, Rosner and Dr. Rosen commenced an article 78 proceeding to force the tapes’ return. The Assistant District Attorney moved for the tapes’ release to the Grand Jury. The Trial Judge declared that he would hear both applications on February 3 and, in the interim, he would listen to the tapes.
On February 3, the Assistant District Attorney served papers opposing the motion to quash and also another Grand Jury subpoena duces tecum seeking “any and all tapes, documents or written communications made by Mr. Rosner [szc] that are relevant to this investigation.” Following the hearing, the Trial Judge, without discussing the privilege claims, ruled that the subpoenas should be quashed because the tapes were irrelevant to the Grand Jury investigation into Vanderbilt’s assault, a ground not raised by petitioners.
On appeal, the Appellate Division unanimously reversed. It ruled that the contents of Tape No. 1 — the tape to Mrs. Rosen — were protected by the marital privilege. In response to a claim of possible tampering, however, the Appellate Division ordered that Tape No. 1 be scientifically tested to ascertain whether it had “been altered in any manner”. As to Tape No. 2, the court conclusorily stated only that “no privilege whatsoever can attach” and ordered its full disclosure to the Grand Jury, as well as any scientific analysis the Grand Jury might deem appropriate.
tape no. 1
Petitioners Dr. Rosen and Rosner argue that Tape No. 1 is protected from discovery by virtue of the marital privilege, and that this protection extends beyond the tape’s *73 contents so as to bar any scientific examination for tampering.
The marital privilege provides that “[a] husband or wife shall not be required, or, without consent of the other if living, allowed, to disclose a confidential communication made by one to the other during marriage” (CPLR 4502, subd [b]). Not protective of all communications, the privilege attaches only to those statements made in confidence and “that are induced by the marital relation and prompted by the affection, confidence and loyalty engendered by such relationship” (Poppe v Poppe, 3 NY2d 312, 315; see, also, Prink v Rockefeller Center, 48 NY2d 309, 314; Fisch, New York Evidence [2d ed], § 597, p 380). Whether a statement comes within the marital privilege is a preliminary question for the court, and involves a determination that must be made on an ad hoc basis (see Poppe v Poppe, supra, p 315; Fisch, New York Evidence, p 381; 4 Bender’s, New York Evidence [1981 ed], § 245.03, subd [1], par [d], p 446.9).
The initial inquiry then is whether Dr. Rosen was induced by the marital relation to prepare Tape No. 1. Communications that would have been made regardless of the marriage’s existence are not protected (see Parkhurst v Berdell, 110 NY 386, 393-394). Nor are communications made without reliance on the marital relation or that are aimed at destroying the marriage (see Poppe v Poppe, 3 NY2d 312, 315, supra; People v McCormack, 278 App Div 191, 196-197, affd 303 NY 782).
Respondent argues that Tape No. 1 is not protected by the marital privilege because, as a suicide message, it was not intended to be received during the marriage and was made in contemplation of destroying it. This argument is unpersuasive. Whether the communication was meant to be received after death is irrelevant; the concern is whether the statement was made because of the marital relation (cf. New York Life Ins. Co. v Ross, 30 F2d 80, 81 [letter to wife found with will held privileged]). To that extent, the communication is made “during marriage” for the purpose of the privilege. Nor is a suicide note the sort of communication excluded from the privilege’s scope as aimed at destroying the marriage. That exception refers to *74 the nature of the statement itself (see, e.g., Poppe v Poppe, 3 NY2d 312, supra [wife’s admission of adulterous affairs destructive of marriage and thus not privileged]). A suicide note to one’s spouse may be a last attempt to preserve the affection that gave rise to the marriage and to explain the reason for the drastic act.
Nothing in the record suggests any reason for concluding that Dr. Rosen’s tape to his wife was not induced by the marital relationship. Thus, the tape must be considered as satisfying the first condition of the privilege.
The next issue in determining if the privilege should prevent disclosure is whether Dr. Rosen’s statement to his wife, made via the cassette recording, was and remains “confidential”. No question can be raised that Dr. Rosen made the tape and “delivered” it to his wife outside the presence of any third parties. Thus, at the time Mrs. Rosen discovered the tape, its message was unknown to anyone outside the marriage and so remained confidential for the purpose of the marital privilege.
That Tape No. 1 passed through the hands of Olick and Rosner’s son, third parties with no justifiable interest in becoming privy to the marital privilege, did not destroy that privilege.[1] The privilege falls only when the substance of a communication, and not the mere fact of its occurrence, is revealed to third parties (see People v Hayes, 140 NY 484, 495-496; cf. Prink v Rockefeller Center, 48 NY2d 309, 313, supra). Neither person through whose hands the tape passed listened to the tape, but instead learned only of its existence. Nor did Mrs. Rosen’s disclosure to the police reveal anything more than that the tape had been made. Indeed, to date, only Dr. Rosen and the Justices of the lower courts know exactly what message is contained in Tape No. 1. The communication’s confidentiality must be deemed intact.
The Appellate Division expressly found the privilege applicable after listening to the tape. As such, there is no *75 basis for the order that the tape be scientifically examined. The request for such an order arose from the expressed concern that Tape No. 1 had been tampered with, particularly through deletions. Once it is determined that the contents of the tape were privileged, it is irrelevant whether there have been erasures or other deletions. What is not said and whether deletions have been made are as much a part of a communication’s “substance” as are the statements actually made.[2]
In summary, Tape No. 1 was made by Dr. Rosen for his wife as a communication made in confidence and induced by the marital relationship. It is, therefore, protected by the marital privilege both as to its contents and as to examination for deletions.
tape no. 2
Petitioners challenge the compelled production of Tape No. 2 by asserting a combination of the attorney-client privilege and the Fifth Amendment privilege against self incrimination.[3] In essence, petitioners claim that material protected in a client’s hands should not lose that protection when possession is transferred to an attorney for the purpose of seeking legal advice.
This court’s analysis starts with the recognition that Rosner may not directly assert any Fifth Amendment claim of protection held by Dr. Rosen. The Fifth Amendment states that “[n]o person * * * shall be compelled in any criminal case to be a witness against himself” (US Const, 5th Arndt). Rosner, against whom the coercive power of the subpoena is directed, would not be incriminating himself by any production of the tape. There being no self incrimination involved, Rosner has no Fifth Amendment right; nor may he assert the right on behalf of his client, against whom no compulsion has been directed (see Fisher v United States, 425 US 391, 396-401).
*76 This does not end the inquiry, however. An attorney may rely on the attorney-client privilege to prevent discovery of materials that would not have been discoverable if in the client’s hands {id., at p 404). This entails a two-pronged review. First, it must be determined whether the material sought was received by the attorney under circumstances giving rise to the attorney-client privilege {id., at pp 402-405). Second, if the attorney-client privilege attaches, attention is then directed to whether the material would be protected by some privilege had it remained in the client’s-possession {id., at p 405).
The attorney-client privilege generally extends to any “confidential communication made between the attorney or his employee and the client in the course of professional employment” (CPLR 4503, subd [a]). The privilege is intended to foster openness between counsel and client so that legal problems can be thoroughly and accurately analyzed (see 8 Wigmore, Evidence [McNaughton rev, 1961], § 2291). Not all communications are covered, however. Only those disclosures “necessary to obtain informed legal advice” fall within the scope of the privilege (Fisher v United States, 425 US 391, 403, supra).
Tape No. 2 was delivered to Rosner in contemplation of the pending Vanderbilt investigation. It was certainly necessary for Rosner to obtain it in order to render complete legal advice. But respondent urges that, in light of the number of people through whose hands Tape No. 2 passed, there was no confidential communication within the meaning of CPLR 4503 (subd [a]).
While it is true that the attorney-client privilege does not attach unless there is a “confidential communication” between counsel and his or her client, this does not require that all aspects of the communication, including its topic, must be confidential for the privilege to attach. Rather, the pertinent “confidence” arises from the attorney-client relationship and the privacy of the conversation or communication to the attorney. By way of example, a husband may consult an attorney in a divorce proceeding; although the wife may very well be aware of the,subject matter of the husband’s conversation, she will be unable to discover the *77 details of his discussion with his attorney from his attorney.
Moreover, a client’s mere intent to disclose to third persons the substance of the discussion held with the attorney does not mitigate the privilege. There must be actual disclosure, otherwise the confidence arising from the attorney-client relationship has not been breached.
In the present controversy, Dr. Rosen has lost any privilege he may have had as to the fact that he made Tape No. 2. As to the tape’s contents, however, Dr. Rosen has lost nothing. Notwithstanding his earlier intent to direct the tape’s message to others, such was never done. That the tape passed through the hands of his colleagues, his wife, his friend Olick, and his attorney’s son does not operate to destroy the confidentiality of the tape’s message because none of these persons ever heard his words.[4] When Rosner finally received the tape, he received it with its contents undisclosed. Whatever the tape’s initial purpose and intended audience, it ultimately was uttered only to Rosner by his client who was seeking legal advice and outside the presence of any third party with no intention that it be passed to another (see Fisher v United States, 425 US 391, 402-405, supra; cf. Rosseau v Bleau, 131 NY 177,183-184).[5] Thus, to the extent that Dr. Rosen’s “communication” with Rosner is defined in terms of the tape’s message, it remains confidential — made in the attorney-client relationship — and protected by the privilege.
Having concluded that the attorney-client privilege attaches, it must now be determined whether Tape No. 2 would be protected had it remained in Dr. Rosen’s possession (see Fisher v United States, 425 US 391, 405, supra). That is, could Dr. Rosen have asserted rights under the Fifth Amendment to prevent the Grand Jury from obtaining the tape had the subpoena been directed to him personally?
*78 Under the holding in Fisher v United States (425 US 391, supra), a document is protected “if the act of producing it results in compelled testimonial self-incrimination", (Note, Constitutional Law — Taxpayer’s Fifth Amendment Privilege Against Self-Incrimination — Fisher v United States, 18 BC Ind & Com LR 998, 1008 [emphasis added]). All three elements must be present for the Fifth Amendment’s protection to be implicated.[6] The use of the subpoena power, of course, provides the requisite governmental coercion to make production of the tape compelled. And it must be assumed that the tape’s content is self incriminatory. The question here is whether “testimonial evidence” is involved.
Testimonial evidence is that which communicates the witness’ ideas or thoughts, that exposes the witness’ mental state or thought process (see United States v Beattie, 541 F2d 329, 331; Comment, No Fifth Amendment Privilege for Accountant-Prepared Tax Records in Attorney’s Possession, 31 Ark L Rev 152,155). Not only is immediate oral testimony covered, but also books and records (see People v Copicotto, 50 NY2d 222, 228-229; United States v Beattie, supra; 8 Wigmore, Evidence [McNaughton rev, 1961], §§ 2263, 2264; Richardson, Evidence [10th ed — Prince], § 526, p 519; Fisch, New York Evidence [2d ed], § 691, p 390; Comment, 31 Ark L Rev 152, 155).[7]
*79 To assert successfully a claim of Fifth Amendment privilege with respect to the production of evidence, the evidence itself must be testimonial and the act of production also must include some testimonial quality (see Fisher v United States, 425 US 391, 409-411, supra; Note, 18 BC Ind & Com LR 998, 1009-1010).
In the present controversy, both the evidence sought and its production, if made by Dr. Rosen, are testimonial in nature. A tape cassette is clearly testimonial in that it is an aural record of the accused’s communication; only live testimony could be any more personal. Moreover, production of the tape by Dr. Rosen would be testimonial by virtue of his authentication, express or implied, of the tape (see 8 Wigmore, § 2264, p 380). By producing Tape No. 2 in response to a subpoena, Dr. Rosen would not only express his belief that this is the tape sought by the Grand Jury, but would be vouching for the circumstances of its preparation, its accuracy, and the conclusions drawn from it. Thus, there is a testimonial element to the production of Tape No. 2 (cf. Fisher v United States, 425 US 391, 412-413, supra; 8 Wigmore, § 2264, p 380).
Although it is concluded that the Fifth Amendment protection is available, this conclusion is grounded on the assumption that Dr. Rosen gave the tape to Rosner. That is a factual question that appears not to have been determined below. For Dr. Rosen’s Fifth Amendment rights to be protected by Rosner through the attorney-client privilege, the tape must have come back into Dr. Rosen’s actual or constructive possession (see United States v Beattie, 541 F2d 329, 331, supra). Thus, a question remains whether Mrs. Rosen was acting as her husband’s agent when she took the tape from Olick and transferred it to Rosner.[8] If so, the tape should be protected.
CONCLUSION
Under all the circumstances, Tape No. 1, prepared by Dr. Rosen for his wife, is completely protected by the *80 marital privilege. Arising out of and made in reliance on the confidence of the marital relation, the tape can be neither heard nor examined for deletions.
It is further held that, when the attorney-client privilege obtains, counsel cannot be compelled to deliver material that would be privileged in the client’s hands. This does not mean that an attorney may serve as a repository for any incriminating evidence that might be held by the client, such as physical evidence of a crime (see Genson v United States, 534 F2d 719, 727). But when, as here, the evidence sought is inherently testimonial and its delivery was for the purpose of seeking legal advice rather than merely concealing evidence, that evidence falls within the privilege.[9]
As noted, Dr. Rosen can assert his Fifth Amendment privilege only if Tape No. 2 came back into his actual or constructive possession. Consequently, there must be a hearing to ascertain the capacity in which Mrs. Rosen was acting when she regained the tape from Click and delivered it to Rosner. If Mrs. Rosen is found to have been acting as her husband’s agent, then Dr. Rosen’s rights remain intact and Tape No. 2 is privileged.
Accordingly, the order of the Appellate Division should be modified, without costs, and the matter remitted to Supreme Court, Bronx County, for further proceedings in accordance with this opinion, and, as so modified, the order should be affirmed.

. There is some question whether Olick was acting as Dr. Rosen’s attorney or merely as a friend before Rosner was hired. If Olick did become Dr. Rosen’s counsel, then issues of confidentiality stemming from the attorney-client relationship would arise (see discussion under “Tape No. 2” of this opinion). Under the analysis taken by this court, however, Olick’s precise role is irrelevant and so it is assumed without deciding that Olick’s status was that of friend, not counsel.

. Indeed, the fact of deletions, if any, would not be discovered except for an improper review of the privileged contents. To order further examination on the basis of an unwarranted reading of the material is an unacceptable bootstrapping.

. Petitioners assert this argument for Tape No. 1 as well. Inasmuch as that tape is wholly protected by the marital privilege, as discussed under “Tape No. 1”, supra, it is not addressed in this portion of the opinion. The following discussion, however, is equally applicable to Tape No. 1.

. It is noted that the People have never asserted nor do they claim, that any of the third parties through whose hands the tape passed have actually listened to the tape.

. The cassette tape recording should be likened to a letter in a sealed envelope. The fact of the letter’s existence is known to all who handled it; but its contents remain private. Similarly, all those through whose hands the tape passed know of its existence, but Dr. Rosen’s message, whatever it may be, remains private.

. It should be noted that, in the context of Fifth Amendment rights, inquiry concerning the confidentiality of the communication as such has no place. The privilege accorded is to protect against compulsory incrimination through one’s own testimony or personal records (see Andresen v Maryland, 427 US 463, 470-471). It is not intended to protect private information per se (id., at p 477).
“Confidentiality” in a constitutional sense may be denominated “expectation of privacy”. This, however, is a concept implicated in Fourth Amendment analysis and should not be raised in considering a claim of compelled self incrimination. As the Supreme Court noted in Andresen, the Fifth Amendment does not protect an individual’s records from seizure under a search warrant, but it does protect against their production under a subpoena {id., at pp 473-474). Thus, whether there was a confidential disclosure is relevant only to an inquiry of the attorney-client relationship, not whether the Fifth Amendment protection attaches.

. Clearly, a magnetic recording of one’s spoken words constitutes the putting of thoughts into speech as much as would writing the words on paper. A tape recording simply is not the same type of physical evidence as is a blood sample or handwriting exemplar (cf. United States v Wade, 388 US 218; Schmerber v California, 384 US 757). The holding in Bellis v United States (417 US 85) is inapposite here as Dr. Rosen prepared the tape in a personal capacity, not as the representative of some legally cognizable, independent entity.

. The attorney cannot be considered as the client’s agent as this would bootstrap all such evidence into the attorney-client privilege. There is also a logical inconsistency in making one principal in the attorney-client relationship the agent of the other for the purposes of that relationship.

. Of course, nothing stated here is intended to shift the burden of establishing the privilege from the party asserting the privilege (see Bloodgood v Lynch, 293 NY 308, 314).