THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v VERNON E. PARKER, JR., Appellant. [854 NYS2d 233]—

Carpinello, J.

Defendant and codefendant Robert Williams were charged with unlawfully entering the home of defendant's mother-in-law shortly past 11:00 P.M. on July 20, 2002 and fatally shooting her and her 14-year-old daughter. At the time, defendant resided in Maryland with his wife and the victims lived in the City of Binghamton, Broome County. Both victims were scheduled to testify against defendant in an upcoming criminal trial in Maryland stemming from allegations that he sexually assaulted the teenage victim.

The People initially sought the death penalty in this case and, therefore, jury selection proceeded as if this were a capital prosecution. In the midst of jury selection, however, the death penalty was declared unconstitutional (*see People v LaValle*, 3 NY3d 88 [2004]). While County Court ultimately discharged the 25 jurors who were found to be qualified to serve at that point, it did not discharge the remaining 300 members of the jury panel who had yet to go through individual voir dire, and a new jury was empanelled from these members. Following a lengthy trial wherein the People presented compelling evidence establishing that defendant and Williams traveled from Maryland to Binghamton in a rental car, forced the victims into their basement and shot them multiple times as they lay holding hands on the floor, defendant was found guilty of three counts of murder in the first degree and one count of burglary in the first degree.[1] Sentenced to life imprisonment without the possibility of parole, defendant appeals. Finding no merit to any of the contentions raised on appeal, we now affirm.

Defendant argues that his oral statement to police the morning after the murders should have been suppressed because it was the result of a warrantless arrest in the absence of probable cause. We are unpersuaded. At around 6:30 A.M. on the morning following the murders, three Baltimore County police officers went to defendant's home at the direction of a supervisor to ensure that defendant's wife was safe and to locate him. At this early point in the investigation, the involved police agencies knew that two members of defendant's family had been executed and that defendant had been immediately named by other family members as being involved because he had previously threatened to kill his wife and her family amid significant domestic strife.

This information provided the Baltimore County police with a

---

1. Williams was likewise found guilty following a separate jury trial (*People v Williams*, 45 AD3d 905 [2007]).

reasonable suspicion that defendant, in accordance with these previously-made threats, might be involved in the double murders and might also pose an immediate threat to his wife (*see People v Batista*, 88 NY2d 650, 654 [1996]). Police suspicions were then heightened by the odd behavior of defendant's wife that morning. Even though the police told her that they were at her home at that early hour out of concerns for her safety, she repeatedly closed the front door on them and refused a request to let them step inside. These circumstances justified one officer's conduct, when defendant finally emerged from the house, in immediately handcuffing him and then conducting a protective frisk (*see id.*; *People v Foster*, 85 NY2d 1012 [1995]; *People v Allen*, 73 NY2d 378, 379-380 [1989]; *People v Perez*, 293 AD2d 329, 329-330 [2002], *lv denied* 98 NY2d 679 [2002]; *People v Dluhy*, 288 AD2d 693 [2001], *lv denied* 97 NY2d 728 [2002], *cert denied* 537 US 978 [2002]).

Moreover, it is undisputed that defendant was advised that he was not under arrest and that the handcuffs were merely a protective measure and would be removed in short order. It is also undisputed that defendant was asked if he would be willing to answer questions at the police station about an incident involving another police agency and he indicated that he would. He was then placed inside a patrol car. Notably, as promised, the handcuffs were removed within 10 minutes. At this time, defendant was again asked, and again voluntarily agreed, to go to the police station for questioning about an incident in Binghamton. No questioning about the murders took place until after defendant had been fully advised of his *Miranda* rights at the police station and he waived them.[2] Under these circumstances, we are unable to conclude that the investigative detention was transformed into an arrest in the absence of probable cause such that defendant's oral statement, or any evidence obtained as a result of it, should have been suppressed (*see People v Allen, supra*; *People v Williams*, 305 AD2d 804, 807 [2003]; *People v Dluhy, supra*; *see also People v Martinez*, 39 AD3d 1159, 1160 [2007], *lv denied* 9 NY3d 867 [2007]).

Defendant next argues that County Court should have discharged the entire jury pool when, in the course of jury selection, the death penalty was found to be unconstitutional. Following the Court of Appeals' decision declaring the death penalty to be unconstitutional, jury selection was temporarily suspended. When it resumed two months later, County Court notified the jury panel of the change in the law and the

---

**2.** After approximately 40 minutes, defendant requested to speak with his attorney and all questioning ceased.

concomitant change in the tenor of this case. The court specifically inquired if any prospective juror was unable to follow the law as changed or to be fair and impartial. None of the prospective jurors expressed such inability. Thereafter, at several points throughout the two-day period it took to select the jury, additional inquiries were posed to various panels concerning whether the change in the law affected any prospective juror's view of the case or ability to serve as a fair and impartial juror. Again, none of the prospective jurors expressed a changed view of the case or an inability to be fair and impartial.

We thus find that County Court properly exercised its discretion in declining to dismiss the entire jury pool (*see generally People v Wells*, 7 NY3d 51, 59-60 [2006]; *People v Cruz*, 292 AD2d 175, 176 [2002], *lv denied* 98 NY2d 696 [2002]; *People v Scott*, 276 AD2d 371, 372 [2000], *lv denied* 95 NY2d 968 [2000]; *cf. People v Purcell*, 103 AD2d 938, 939 [1984]). In short, despite the unusual turn of events in the midst of jury selection, the voir dire record refutes defendant's claim that the change in law tainted the remaining members of the jury panel so as to deprive him of a fair trial and further refutes the notion that anything other than a fair and impartial jury was selected (*see generally People v Ramirez*, 23 AD3d 500 [2005], *lv denied* 6 NY3d 817 [2006]; *People v Cruz, supra*; *People v Miller*, 239 AD2d 787, 790 [1997], *affd* 91 NY2d 372 [1998]; *People v Solis*, 173 AD2d 1089 [1991], *lvs denied* 78 NY2d 974, 1081 [1991]). To the extent that defendant also claims that numerous prospective jurors were excused "for no legal reason," relying on *Hildreth v City of Troy* (101 NY 234 [1886]), we find this argument to be patently without merit since these challenged jurors were dismissed because of their views concerning the death penalty (*see* CPL 270.20 [1] [f]) at a time when same had yet to be declared unconstitutional (*cf. Hildreth v City of Troy, supra*).

Next, we find that defendant failed to make a prima facie case of purposeful discrimination by the People's use of a peremptory challenge against an African-American prospective juror (*see Batson v Kentucky*, 476 US 79 [1986]; *People v Childress*, 81 NY2d 263, 266-268 [1993]) and, therefore, the burden never shifted to the People to respond with a race neutral explanation for it (*see People v Wells*, 7 NY3d at 58; *People v Beverly*, 6 AD3d 874, 875-876 [2004], *lv denied* 3 NY3d 637 [2004]). In any event, even assuming a prima facie showing, the record supports County Court's finding that the People indeed provided a race neutral explanation for the challenged juror—which pertained to her demeanor during an exchange about stipends (*see People v Wells, supra*)—and this finding is entitled to great deference

by this Court (*see People v Hernandez*, 75 NY2d 350, 356 [1990], *affd* 500 US 352 [1991]).

Next, no testimony of defendant's wife at trial violated the marital privilege (*see* CPLR 4502 [b]; CPL 60.10). First, statements made by defendant to his wife concerning his plans and activities on the evening of the murders were nothing more than "daily and ordinary exchanges between the spouses" unprotected by the marital privilege (*People v Melski*, 10 NY2d 78, 80 [1961]; *see People v O'Dell*, 36 AD2d 774 [1971]; *People v LaPlanche*, 193 AD2d 1062, 1063 [1993], *lv denied* 82 NY2d 756 [1993]) and were, in any event, essentially repeated to the Baltimore County police lieutenant who interviewed him (*see Matter of Vanderbilt [Rosner—Hickey]*, 57 NY2d 66, 74 [1982]; *People v Weeks*, 15 AD3d 845, 846 [2005], *lv denied* 4 NY3d 892 [2005]). Moreover, defendant's conduct in pulling out a gun and simultaneously directing his wife "to get down" when she otherwise wanted to open the door to the Baltimore police when they first knocked on the door within hours of the murders were properly found to constitute threats and, therefore, also unprotected by the marital privilege (*see People v Mills*, 1 NY3d 269, 276 [2003]; *Poppe v Poppe*, 3 NY2d 312, 315 [1957]; *People v Edwards*, 151 AD2d 987 [1989], *lv denied* 74 NY2d 808 [1989]).

We likewise find no merit in any of defendant's arguments concerning alleged erroneous evidentiary rulings by County Court during the trial. In particular, permitting the People to introduce the entire videotape of the crime scene (without redacting that portion depicting the victims' bodies, as requested by defense counsel) was not an abuse of discretion and did not deny defendant a fair trial. The challenged segment was not so gruesome as to unduly inflame the jury and thus prejudice defendant (*see People v Alvarez*, 38 AD3d 930, 931-932 [2007], *lv denied* 8 NY3d 981 [2007]; *People v Mastropietro*, 232 AD2d 725 [1996], *lv denied* 89 NY2d 1038 [1997]; *People v Bernard*, 214 AD2d 578 [1995], *lv denied* 85 NY2d 969 [1995]).

In any event, any error in any of the challenged evidentiary rulings would be harmless given the overwhelming evidence of guilt (*see People v Crimmins*, 36 NY2d 230 [1975]). In addition to proof that both victims were scheduled to testify against defendant in the upcoming criminal trial, the People also presented proof that a car rented for defendant's use the night before the murders had been driven approximately 600 miles between then and the day after the murders, defendant's fingerprint was found inside this rental car, and the keys to it were found hidden under his mattress. In addition, the soles of

his shoes perfectly matched footprints at the murder scene (including a piece of tape stuck to the bottom of one shoe), fibers on these shoes were consistent with carpet fibers inside the victims' home and two men generally fitting the description of defendant and Williams were seen fleeing the murder scene within minutes of a 911 call by the teenage victim reporting "a man in [her] house." Furthermore, cell phone records placed defendant and Williams traveling north from the Baltimore, Maryland, area throughout the evening of the murders (with one such record placing Williams 80 miles from Binghamton at approximately 9:00 P.M.), Williams was ultimately identified from a lineup as one of these fleeing men and the victims were killed with a 9 millimeter semiautomatic pistol that had been given to defendant by a friend the day before the murders.

Finally, we are unpersuaded that County Court erred in denying a CPL 330.30 motion without a hearing or that defendant's sentence is harsh and excessive.

Peters, J.P., Rose, Kane and Malone Jr., JJ., concur. Ordered that the judgment is affirmed.