[Civ. No. 6897. First Appellate District, Division One.—January 31, 1930.]

FLORENCE C. AYRES et al., Appellants, v. C. A. WRIGHT et al., Respondents.

Raymond Perry for Appellants.

Geary & Geary and C. J. Tauzer for Respondents.

JOHNSON, J., *pro tem.*—This action was instituted to recover damages for personal injury sustained by the plaintiff Florence C. Ayres in consequence of a fall, resulting from the sudden disjunction of a rustic railing, forming the outer barrier of the porch of a cottage owned by the defendant Mamie C. Wright, and hired by plaintiffs.

The action was tried by a jury, which, under direction of the court, returned a verdict in favor of the defendant Mrs. Wright. From the judgment entered upon that verdict the plaintiffs have appealed.

The legal question presented is the familiar one as to the liability of a landlord for injury to a tenant, due to a defect unknown to either.

The defendant Mamie C. Wright, a resident of Santa Rosa, was the owner of a summer cottage at Rio Nido, on the Russian River, which had been built by her in 1908. Attached to the cottage was a porch running along the front and one side, where a flight of steps led to the ground. The porch, both in the front and on the side, was guarded by a railing made of redwood saplings, toe-nailed into the redwood uprights. The front porch was covered with a roof, but the side porch, built as a pergola, was exposed to the action of the elements; and through a hole cut in the floor near the junction of the front and the side porch, there grew a redwood tree, stretching above the porch and the cottage. When the guard-rail was constructed, the saplings, both those in the front and those on the side, had their covering of bark. In course of time the bark had been abraded from the front rails, but still clung to the lengths composing the side railing and also to the uprights.

Beneath that bark, and in a way to be unobservable to the eye, the wood had rotted at the joints, particularly at the spot where the side railing was nailed to the corner upright

near the redwood tree. It was at this point that the side railing broke loose from the upright when Mrs. Ayres and a friend were leaning against it, and caused Mrs. Ayres to be precipitated several feet to the ground, whereby she suffered grave injury to the neck and spine.

The plaintiffs had taken possession of the cottage on July 1, 1925, Mr Ayres having rented it for the use of his family for the month of July. The accident occurred on July 5th.

The owner, Mrs. Wright, being an invalid and of the age of about sixty-seven years, had not visited the cottage for more than a year and a half prior to the accident; and in hiring the cottage Mr. Ayres dealt with Mr. Wright, whom he supposed to be the owner. Accordingly, when the suit was brought, Mr. Wright was named as the sole defendant; and it was only when his deposition was taken that Mrs. Wright became known to the plaintiffs as the owner, whereupon she was joined as a defendant. Between that time and the time of trial Mr. Wright died; and thereafter the action was dismissed as to him. One of the points urged as justification for reversal is the ruling of the court in sustaining objection to the introduction by plaintiffs of Mr. Wright's deposition, upon the ground that under subdivision 1 of section 1881 of the Code of Civil Procedure, testimony of the husband cannot be received without the consent of the wife; and on the further ground that a deposition taken before Mrs. Wright was made a defendant was not admissible against her.

While Mrs. Wright's answer admitted a hidden defect in the railing, it denied all knowledge of the defect on the part of Mrs. Wright or her husband, who acted as her agent in renting the cottage on this occasion. The evidence was directed largely, therefore, to the question of knowledge.

The Wrights themselves had not occupied the cottage, except occasionally at the week-end, for a period of about ten years; but had been in the habit of renting the house, furnished, during the summer months, or allowing members of their family to occupy it. And in preparation for the occupancy of the plaintiffs, Mr. Wright had taken a carpenter to the premises in the latter part of June. This was done at Mrs. Wright's suggestion, and under her instructions to repair certain doors and windows and "any-

thing else that needed attention." A few days later Mrs. Wright sent her housekeeper, together with Mr. Wright and a daughter-in-law, to set the house in good order. No weakness of the railing was observed by any of these persons; and two days before the accident Mrs. Ayres remarked to her husband that the cottage was "about the best house we have occupied since we have been coming up the river with the children."

Indeed, it is conceded by plaintiffs and all their witnesses that the bark on the side rails looked new, and the railing appeared sound; in fact, stronger than the bare front railing. Even Mrs. Ayres herself testified that the side railing looked safe because the bark was heavy, and one could not see that it was rotten underneath. The testimony of the witnesses of the defendant is to like effect. The railing gave way when Mrs. Ayres and a visitor were "resting against it," their combined weight being about 315 pounds.

According to the testimony of some of the defendant's witnesses the railing had been subjected to lesser strains in June, 1925, without showing weakness. On June 20th a party composed of the son of the Wrights, his wife and children and two friends, Mr. and Mrs. Woodward, had visited the cottage, and Mr. Woodward had walked without any mishap along the top of the side railing from opposite the redwood tree to the corner and then along the entire front railing. And a few days later, on the visit of the daughter-in-law with Mrs. Wright's housekeeper to set the house in order, bedding and mattresses were hung over the side railing and beaten. On that occasion, also, the daughter-in-law had sat upon the rail, holding her young child, but noticed no weakness. Likewise, occupants of the cottage in 1924 testified that though their children had climbed upon the railing they had had no reason to fear for its soundness.

Because of this evidence, in contrast with evidence · of the actual rottenness of the wood beneath the bark, as disclosed after the accident, plaintiffs contend that the case should have gone to the jury without a specific direction. But it must be remembered that the defendant admitted that there was a condition of decay. Hence, this point was not in issue. The issue was whether the circumstances showed Mrs. Wright to have had knowledge of the danger-

ous condition. Upon this issue there is really no conflict. All the testimony is in agreement that the defect was so latent as to be beyond suspicion to an observer.

In the appellants' brief stress is laid upon a statement by Mrs. Wright that at some time prior to 1923, but otherwise undefined, she had had her husband drive some spikes into the railing. She further testified that this was done not because of any noticeable defect but "to be sure that it was secure." Such testimony raises no inference of any known defect when the cottage was let to plaintiffs in June, 1925.

There being not a glimmer of evidence imputing to Mrs. Wright either knowledge or a want of knowledge due to her own culpability, the sole question upon the conclusion of the testimony was the question of law, which the court resolved correctly in its direction to the jury.

The controlling principle has been so clearly expounded in our decisions as to require no elaboration here.

A landlord is not an insurer of the safety of premises about to be let. If there are patent defects discoverable by reasonable examination, knowledge of them is imputed to the tenant. On the other hand, if there are hidden defects known to the landlord, and not discoverable by the incoming tenant by a reasonable inspection, the landlord is then under duty to make disclosure. But where the defect is hidden and unknown to the landlord, and there is nothing to charge him with bad faith, fraud or concealment, the tenant on entering the premises takes them without implied warranty, for better or for worse, in the condition in which he finds them, and must assume the risk of injury from defects of which both parties are innocently unaware. After-acquired knowledge of pre-existing defects will not alone suffice to make the landlord liable.

Discussion of these rules in their relation to liability for injury suffered through collapse of a railing is to be found in *De Motte* v. *Arkell*, 77 Cal. App. 610, 621 [247 Pac. 254], and *Hassell* v. *Denning*, 84 Cal. App. 479, 481, 482 [258 Pac. 426]. For a general exposition of the law on the subject, reference may be made, also, to *Daley* v. *Quick*, 99 Cal. 179, 183 [33 Pac. 859]; *Smelser* v. *Deutsche Kirche*, 88 Cal. App. 469, 473 [263 Pac. 838]; *Nelson* v. *Myers*, 94 Cal.

App. 66 [270 Pac. 719]; *Farber* v. *Greenberg,* 98 Cal. App. 675 [277 Pac. 534].

Throughout the trial the plaintiffs were insistent in impressing upon the judge and the jury that the defect in the railing was so effectually concealed beneath the bark as to escape their notice; and there being no evidence before the court to charge Mrs. Wright with notice any more than the plaintiffs themselves, she was exempt from liability and entitled to a verdict at the direction of the court.

The plaintiffs urge, however, that the jury should have been permitted to determine not merely whether Mrs. Wright did know of the latent defect, but whether by reasonable care she could have discovered the unsafe condition. In this contention reliance is placed on the decision in *Hines* v. *Wilcox,* 96 Tenn. 148 [54 Am. St. Rep. 823, 34 L. R. A. 824, 832, 33 S. W. 914]. This annexation of a new element imported from the law of negligence is, as said by the writer of the annotation in 34 L. R. A. 824, and again in 34 L. R. A. (N. S.) 798, a departure from the law of landlord and tenant as almost universally administered. And while the Tennessee court has been followed in Georgia, its innovation has been expressly repudiated in Iowa in *Kutchera* v. *Graft,* 191 Iowa, 1200 [26 A. L. R. 1257, 184 N. W. 297]; in Kentucky in *Franklin* v. *Tracey,* 117 Ky. 267 [63 L. R. A. 649, 77 S. W. 1113, 78 S. W. 1112]; in Maine in *Whitmore* v. *Orono P. & P. Co.,* 91 Me. 297 [64 Am. St. Rep. 229, 40 L. R. A. 377, 39 Atl. 1032]; in Massachusetts in *O'Malley* v. *Twenty-Five Associates,* 178 Mass. 555 [60 N. E. 387], the opinion being written by Judge Holmes; and in Ohio in *Shinkle Co.* v. *Birney,* 68 Ohio St. 328, 335, 336 [67 N. E. 715], where the court says that in cases of this character there is no place for the doctrines or phrases of the law of negligence; and that what the law exacts is not care,.but honesty.

An enlightening discussion of the topic is furnished in *Stumpf* v. *Leland,* 242 Mass. 168 [136 N. E. 399], which likewise presented a case of injury suffered by reason of a fall due to the defective railing of a porch. The trial court had instructed the jury that if the landlord was aware of the defect, or, in the exercise of ordinary care and prudence,.ought to have been aware of it, and had left the tenant unaware, he had failed in his duty. This instruction was de-

clared on appeal to be a misconception of the principles governing the relation of landlord and tenant. After reiterating the general rule the court said: "This obligation does not exist in the absence of knowledge on the part of the landlord. It does not impose the duty of inspection in order to find defects and consequent liability for negligent performance of such inspection."

It may sometimes happen, indeed, that there are conditions which may tend to create a nuisance, with surrounding circumstances such as would reasonably and justly put an owner on inquiry. And when a landlord knows of specific facts calculated to subject occupants to dangers, his actual knowledge of such facts may justify the conclusion, based on the teachings of common experience, that there was notice of defects equivalent to. knowledge. Hence, when, under such circumstances, liability attaches, it is because, in the eye of the law, the landlord did know, not because he ought to have known.

In the case last cited the court, referring to such instances, says (p. 173): "That is far different from allowing anybody to infer a duty of inspection and then to impose liability for what it may be thought he 'ought to have known,' if he had performed such inferred duty. There is no duty of inspection resting on the landlord in such a case. It is only when the knowledge of specific facts concerning the condition of the tenement, constituting defects, has come to him that the question of liability can arise."

And in closing its discussion the court restates the rule in these words: "It is plain that the rule is now as it has been, that, in the absence of express contract or of fraud or misrepresentation, a tenant cannot recover of his landlord for injuries resulting from a hidden defect in the demised premises unless the landlord actually knew of the facts constituting the defect and failed to disclose the defect to the tenant. There is no duty resting on the landlord to make, for the benefit of the tenant, search for hidden defects. Whether the landlord ought to have known of the defect is an inquiry which does not arise in this connection and which has no relevancy upon the question of liability."

█ A landlord is always under duty not to expose his tenant to risks of which he has knowledge. But there must be proof of knowledge or its equivalent; and knowledge is

not shown by evidence of inspection which failed to lead to discovery. The question is not what the landlord ought to have done or known, but what he did in fact do and know. (*Clark* v. *Sharpe*, 76 N. H. 446, 447 [41 L. R. A. (N. S.) 47, 83 Atl. 1090].)

It remains to consider plaintiff's objections to the rulings of the court excluding certain evidence. Objection was sustained to the introduction by plaintiffs of Mr. Wright's deposition, taken before Mrs. Wright was made a defendant. It is insisted that notwithstanding the language of subdivision 1 of section 1881 of the Code of Civil Procedure, the testimony of the husband was admissible because, it is contended, he was his wife's agent in supervising the premises.

In some jurisdictions not governed by statutory regulation an exception is made by judicial decree in favor of admission of testimony by a spouse who acted as agent for the other. Then, again, some states have a statute expressly embodying such an exception, as in Arkansas (Kirby's Digest, sec. 3095), Missouri (Stats. 1919, sec. 5415), Oklahoma (Comp. Laws 1909, sec. 5842), and perhaps others.

We are governed, however, by a code provision which makes no such exception, and it is presumed that, in the absence of an express exception, no such qualification of the rule was intended. (*Trout* v. *Ogilvie*, 41 Cal. App. 167, 174 [82 Pac. 333] ; *Forbes* v. *City of Los Angeles*, 101 Cal. App. 781 [282 Pac. 528].) In construing an enactment identical in language, the Supreme Court of Idaho declared that the statute was controlling and admitted no exceptions other than those placed there by the legislature. (*Watkins* v. *Lord*, 31 Idaho, 352 [171 Pac. 1133] ; see, also, *Falk* v. *Wittram*, 120 Cal. 479, 481 [65 Am. St. Rep. 184, 52 Pac. 707] ; *Marple* v. *Jackson*, 184 Cal. 411, 414 [193 Pac. 940].)

Likewise, in Michigan, under a statute reading, "A husband shall not be examined as a witness for or against his wife without her consent," the court declared, in *People* v. *Werner*, 225 Mich. 18, 22 [195 N. W. 697], that even to call the husband as a witness, and put the wife to the necessity of refusing consent in the presence of a jury, was a transgression of the rule, which in that particular case was deemed sufficiently prejudicial to cause reversal.

While there may be reasons in favor of modification of the rule embodied in our statute there are also reasons against it, which are vigorously expressed in *State* v. *Kephart*, 56 Wash. 561, 563–565 [26 L. R. A. (N. S.) 1123, 106 Pac. 165].

Even where the exception is made, the power to compel the testimony of a spouse is closely guarded. The agency must be one in fact; and not merely activity, unexpected and unauthorized, but exercised as an accompaniment of a harmonious conjugal relationship. (*Oklahoma Natural Gas Co.* v. *Crenshaw*, 91 Okl. 269 [217 Pac. 370].) And after proof of actual agency and its scope, the questions must be so framed as to confine the evidence within its legitimate limits. The testimony of a husband whose competency as a witness depends on his agency for the wife must be limited strictly to those things which he did and had a knowledge of by reason of his agency, and cannot be extended to matters not embraced within the real scope of his agency. (*Goesel* v. *Davis*, 100 Wis. 678 [76 N. W. 768] ; *Gottschall* v. *Geiger*, 207 Mo. App. 89, 107–110 [231 S. W. 87] ; *Council Grove Ry. Co.* v. *Center*, 42 Kan. 438 [22 Pac. 574] ; *St. Louis Ry. Co.* v. *Courtney*, 77 Ark. 431 [92 S. W. 251].)

We approve the action of the trial court in excluding the husband's deposition, both by reason of the statutory disability of the witness and because the deposition had been taken before the wife was made a party. (*Wright* v. *Sparks*, 127 Ga. 365 [56 S. E. 442].) In consequence of the latter fact she had not had her opportunity to cross-examine. We may add that our examination of the deposition convinces us that even if it had been admitted, it contained nothing to alter the aspect of the case. The effort was to show that at times prior to 1925 some repairs had been made to the railing, and to ascertain how often Mr. Wright had tested it. Yet there was no proof that in making such repairs or any tests or examination Mr. Wright was acting as an agent, or doing more than rendering those helpful amenities customary between husband and wife. His actual agency, so far as shown in the evidence, did not go beyond the letting of the premises to plaintiffs and the preparations immediately preceding their occupancy.

Exception is taken, also, by plaintiffs to the refusal to admit certain proffered testimony to the effect that after

the accident Mr. Wright was heard-by a witness to say to Mr. Ayres that he knew the railings were weak, but hoped they would last another year. This statement is represented to have been made on July 7, 1925, when Mr. Wright visited the premises at his wife's request for the purpose of having the railings removed. He was present for that special purpose, and not to make declarations concerning matters disassociated from the business on hand. Any statement as to past incidents or former state of mind or opinions constituted no part of the *res gestae* in the cause before the court, and under the settled rule could in no way be binding on Mrs. Wright. Hence there was no error in exclusion of the offered testimony. (10 Cal. Jur. 1116–1118.)

The accident was, indeed, most unfortunate; and we doubt not that the trial court, equally with ourselves, entertained sympathy for plaintiffs both on account of the serious injury to Mrs. Ayres and the heavy medical and hospital expenses incident to her care. The evidence was not of a character, however, to cast legal liability upon Mrs. Wright; and, accordingly, the court was in duty bound to direct a verdict in her favor.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.