114 Cal.App.2d Supp. 834 (1952)
CREDIT BUREAU OF SAN DIEGO, INC. (a Corporation), Appellant,
v.
GEORGE SMALLEN, Respondent.
California Court of Appeals. 
Sept. 19, 1952.
 Ruel Liggett, Roy M. Cleator and E. C. Davis for Appellant.
 Ray Miller for Respondent.
 BURCH, J.
 Plaintiff sues for $1,781.25 as the unpaid balance of $1,900 loaned to defendant, George Smallen, by plaintiff's assignor, Frank Charles Szehner, Jr. Defendant admits the loan and defends upon the ground that it was fully repaid.
 Frank Charles Szehner, Jr., and Aileen Szehner were husband and wife Aileen is defendant's sister. Frank Charles [114 Cal.App.2d Supp. 835] Szehner, Jr., was a chief petty officer in the United States Navy in September, 1948. About that time, he received naval orders to proceed to Honolulu for a tour of duty expected to extend over a period of two years. A family conference was had, at which Szehner and his wife, Smallen, the defendant, and Mrs. Mabel Smallen, mother of Aileen and George, were present. At this conference, it was mutually arranged between the Szehners on their part that they would lend George Smallen $1,900, and that if and when Smallen would accumulate funds toward the repayment of this loan, he would invest the same in United States Series E bonds in the name of himself, Szehner and his wife, Aileen, but retain the bonds in his possession, to be used to defray the expenses of an expected major operation of the then invalid mother of Aileen and George. By the terms of the arrangement, the bonds could be cashed by Smallen at any time and the proceeds used by him should the necessity arise.
 [1] Pursuant to this arrangement, Szehner purchased a bank cashier's check in the amount of $1,900 payable to Smallen, which was paid for by funds from the joint account of himself and his wife, Aileen. Smallen received the check in January, 1948. Shortly after the Szehners arrived in Honolulu, Smallen discovered that regulations for the issuance of United States Series E bonds would not permit their purchase in the names of more than two persons as joint owners, whereupon he testified that he promptly wrote the Szehners in Honolulu informing them that this was the case, stating that he had commenced the purchase of the bonds in the names of himself and his sister, Aileen Szehner, only and asking if this would be all right. Mrs. Szehner replied, agreeing for the Szehners to the purchase of the bonds in these names. He continued his purchases in this manner until he had acquired bonds in the names of himself and sister of the cash value of $1,781.25, at the time the Szehners returned to California about the first of March, 1950. We quote from the settled statement on appeal:
 "That in the latter part of March or about the first of April, 1950, Frank Szehner and his wife, who were then living together as husband and wife at Escondido, California, discussed the advisability of securing the bonds from Smallen in order to pay for a new Ford automobile. As a result of this discussion Szehner thereupon directed his wife to go to Smallen and secure the bonds from him, which she did. Szehner denied having at any time authorized his wife to [114 Cal.App.2d Supp. 836] receive the bonds from Smallen. At that time Mrs. Szehner, intending to divorce her husband, had no intention of turning the bonds over to her husband, but told Szehner Smallen had delivered the bonds to her. She did not, however, then disclose her intention to divorce her husband either to her husband or to Smallen, telling her brother simply that her husband had asked her to get the bonds. Smallen told her that they were at the bank and that he would give them to her the next day, which he did. The bonds he then deliver to her were of the cash value of $1781.25. Szehner testified that a few days thereafter he asked Smallen for the bonds, who informed him that he had previously delivered them to Aileen, and that the difference between $1781.25 and the $1900.00 loan, to-wit, the sum of $118.75 he would pay in cash. It is not denied that Smallen did this the following day by depositing that sum in the Escondido bank account of Szehner and his wife. Szehner thereupon closed the account receiving the fund, subsequently establishing a bank account in his own name at Coronado. ..."
 "That none of the bonds delivered by Smallen to Mrs. Szehner were ever delivered by her to her husband nor did she deliver any of the proceeds of the sale of such bonds to her husband. At the time of the delivery of the bonds by Smallen to his sister the Szehners were having domestic difficulties but were living together as husband and wife. The Szehners' first separation occurred about a month subsequent to Smallen's delivery of the bonds to Aileen Szehner. ..."
 An interlocutory decree of divorce was granted to Mrs. Szehner on October 31, 1950, and a final decree on November 1, 1951. The divorce action was commenced on the 14th of April, 1950. At that time, Mr. Szehner alleged in his complaint:
 " 'That the parties own community property consisting of real estate improved with a small dwelling house, household furniture, and approximately $4,000.00 in United States Savings Bonds; that the defendant wife of plaintiff has placed said Savings Bonds in the safety deposit box in her name; that plaintiff is informed and believes, therefore alleges, that said safety deposit box is located at the Escondido Branch of the Bank of America, ...' "
 Mr. Szehner testified as follows:
 "Q. Now, this $4,000.00 in bonds comprised what? The four thousand that you referred to in that paragraph? A. It comprised what her brother said that he gave her. [114 Cal.App.2d Supp. 837]"
 "Q. And you, together with the other bonds that you had? A. The family savings. ..."
 "Q. ... You intend us now to believe that this $4,000.00 in bonds that you refer to as community property included the $1900.00 that had been paid for from George Smallen to your wife. ...? ... A. Yes."
 To the subsequent action filed by Mrs. Szehner, Mr. Szehner filed an answer and crosscomplaint, and alleged, among other things:
 " '... that the plaintiff has truthfully set forth all the community property of the parties hereto, alleges the fact to be that plaintiff has in her possession approximately $5,000.00 United States Government Bonds and that plaintiff herein will dispose of said bonds unless she is restrained by the court from so doing.' "
 There was further read into evidence an affidavit by Mr. Szehner's former attorney in the divorce action, in which it is alleged on information and belief:
 "Q. ... that Eileen Szehner, plaintiff herein, has in her possession, United States Government Bonds purchased during the married life of the parties herein, together with United States Bonds purchased ... in the name of the minor child to the parties hereto and or any other bonds in the name of plaintiff and or the defendant herein, ..."
 The court found that defendant became indebted to Frank Charles Szehner, Jr., plaintiff's assignor, in the sum of $1,900 for and on account of money loaned said defendant, without interest, at defendant's special instance and request; that it is true that from March of 1948 until on or about the first of March, 1950, plaintiff's assignor was an enlisted man in the United States Navy, stationed outside of the territorial limits of the United States; but it is not true that the said account of $1,900 for money loaned had not been paid, but on the contrary the court finds that it is true that said loan was fully paid and discharged during the month of April, 1950, and prior to the commencement of this action. Judgment was accordingly entered for the defendant.
 We think the evidence supports a finding that the loan was repaid. It is clear from the record that the full benefits of the repayment were accepted and acted upon by Frank Charles Szehner, Jr., in the divorce action, and in that action he received the benefits of the fund as repaid.
 During the course of the trial, the wife testified that upon their receipt in Honolulu of the letter written by the [114 Cal.App.2d Supp. 838] defendant advising them of the necessity of buying the bonds in only two names, her husband, Frank Charles Szehner, Jr., told her to express to her brother Szehner's satisfaction with the new arrangement. At the time this evidence was elicited, Mrs. Szehner had testified on direct examination:
 "A. ... my husband and I received a letter from my brother saying that he couldn't get it in all of our names."
 "Q. Did you discuss that letter with your husband? A. Yes."
 "Q. You were then in Honolulu, were you? A. Yes."
 "Q. What was said between you and your husband about this letter? A. Well, my brother wrote and said that,---"
 "Mr. Liggett: I object to that conversation between husband and wife as privileged and therefore not admissible in evidence without the consent of the husband. ..."
 "Q. Now, before we go into the conversation with you and your husband, did your husband direct you to reply to George Smallen to the contents of the letter that we are discussing? A. You mean after we received the letter from my brother, did my husband tell me to write back?"
 "Q. Yes? A. He told me that it was perfectly all right to go ahead the way that my brother wrote and told us how he was going to get the bonds, that that was all right."
 "Mr. Liggett: Now he is getting something in the back door that he couldn't get in the front door. I will object to that, move to strike the testimony she is attempting to give."
 "The Court: May be stricken for the purposes of the objection."
 "Mr. Liggett: I object to it on the grounds it is privileged. ..."
 "The Court: Well, the question whether or not the plaintiff has waived the rights under Section 1881 of the Code of Civil Procedure is now before the Court in this respect; on cross examination, I believe plaintiff denied the matters which she is about to testify to. Now, whether or not the defendant can now bring it in for the purpose of impeaching his statement is a question for the Court to determine. I am inclined to believe that by virtue of his denial and perhaps he has waived his right to the provisions of Section 1881 C.C.P. Objection will be overruled."
 "Mr. Miller: Read the question please."
 "(Pending question read by the reporter)."
 "A. Yes. He said that that was perfectly all right to go ahead. That it was all right to go ahead and do that because that was the whole idea of leaving the money there, was so [114 Cal.App.2d Supp. 839] that they could use it if it was necessary. If they went ahead and put it back in some way that they couldn't use it and we were in Honolulu and couldn't us it, it wouldn't have done any good to leave it there in the first place."
 "Q. Did he at that time or at any other time make any objection to the proposal that these bonds be purchased in your name and the name of your brother? A. No. ..."
 "A. ... I wrote to my mother and brother and told them it was perfectly all right."
 Section 1881, subdivision 1, of the Code of Civil Procedure provides:
 "1. Husband and wife. A husband can not be examined for or against his wife without her consent; nor a wife for or against her husband, without his consent; nor can either, during the marriage or afterward, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding by one against the other, ..."
 In People v. Loper, 159 Cal. 6 [112 P. 720, Ann.Cas. 1912B 1193], it was recognized that a divorced woman could not testify as to communications during marriage, although she might testify as to other matters such as the mental condition of her husband.
 In Ayres v. Wright, 103 Cal.App. 610 [284 P. 1077], it was held under the section and subdivision quoted that one spouse may not testify for or against the other without consent. The code section contains no exception in case of agency and so the testimony was not admissible. In the opinion in that case, the court says:
 "We are governed, however, by a code provision which makes no such exception, and it is presumed that, in the absence of an express exception, no such qualification of the rule was intended. (Trout v. Ogilvie, 41 Cal.App. 167, 174 [182 P. 333]; Forbes v. City of Los Angeles, 101 Cal.App.781 [282 P. 528].) In construing an enactment identical in language, the Supreme Court of Idaho declared that the statute was controlling and admitted no exceptions other than those placed there by the Legislature. (Watkins v. Lord, 31 Idaho 352 [171 P. 1133]; see, also, Falk v. Wittram, 120 Cal. 479, 481 [52 P. 707, 65 Am.St.Rep. 184]; Marple v. Jackson, 184 Cal. 411, 414 [193 P. 940].)"
 See, generally, on this subject, a note in 2 California Law [114 Cal.App.2d Supp. 840] Review, 148, and 2 Wigmore on Evidence, 3d edition, sections 600- 603, inclusive.
 Certain communications, however, have been held not to be privileged. (Poulson v. Stanley, 122 Cal. 655 [55 P 605, 68 Am.St.Rep 73], Savings Union Bank & Trust Co. v. Crowley, 176 Cal. 543, 547 [169 P 67]; Estate of Gillett, 73 Cal.App.2d 588 [166 P.2d 870].)
 [2] An exception to the rule is found in waiver which will occur when one spouse relies upon a contract with the other, and so it was held in Tobias v. Adams, 201 Cal. 689 [258 P. 588], that in an action by a third party against one of the spouses the privilege respecting marital communications does not exist where the spouse sued relies upon a contract made with the other spouse. That was a suit by creditors to set aside a deed made by Adams to his wife, alleged by plaintiff to have been made to defraud the husband's creditors. The husband and wife had made and filed for record, which was pleaded in the suit, an agreement by which the husband relinquished all his community interests standing in his name, and certain other property. It was held that the provisions of section 1881, Code of Civil Procedure, did not apply. As the defendants relied upon the written agreement, they could not take advantage of the privilege that either spouse, without the consent of the other, may not testify to communications. It was held that the conversations between the husband and wife might be proved by the wife though the husband objected.
 We think, on the authority of that case, it was not error to admit the testimony of the wife under the similar circumstances here present. The nature of the contract between the husband and wife and the wife's brother is the issue made by the complaint. By raising this issue, the husband thereby opened the door to determine what that contract was in its entirety, including any amendments or novations thereof.
 "It would be monstrous (says the court in the Adams case, page 699) if husband and wife might between themselves conspire to defraud the creditors of the one or the other and to conceal their act produce a written instrument which is immune from all inquiries and which must be accepted by the defrauded party as final. The freedom of contract between husband and wife and the power to transmute community property into separate property or vice versa by agreement between themselves renders it imperative that when such an agreement is relied upon by their joint answer, thereby the whole subject matter of said agreement is open [114 Cal.App.2d Supp. 841] to inquiry which may include communications from one to the other. This we understand upon examination of the transcript to be the effect of the holding in Johnston v. St. Sure, 50 Cal.App. 735 [195 P. 947], rehearing denied by this court."
 The informality of the family agreement sufficient for the needs of the parties until divorce litigation commenced, gives the agreement here in suit all the weight due to a written, recorded, agreement between the husband and wife alone. We think, under the circumstances here present, the privilege was waived by the husband, and find no error in the admission of the evidence.
 Section 1881, subdivision 1, of the Code of Civil Procedure, was not enacted to be used as an instrument to prevent justice, or to permit a husband to initiate litigation which could only succeed by locking the lips of his former wife.
 Judgment is affirmed.
 Turrentine, P. J., concurred.