909 P.2d 449

Patricia ULIBARRI and Peter Ulibarri, her husband, Petitioners,

v.

SUPERIOR COURT of the State of Arizona, in and for the COUNTY OF COCONINO, the Honorable James Hancock, a judge thereof, (sitting in Yavapai County), Respondent Judge,

Dean GERSTENBERGER and Marta Gerstenberger, Real Parties in Interest.

1 CA–SA 95–0026.

Court of Appeals of Arizona, Division 1, Department C.

Aug. 22, 1995.

As Corrected Aug. 22, 1995.

Petition for Review Denied and Cross–Petition for Review Granted Jan. 17, 1996.*

* Corcoran, J., of the Supreme Court, did not participate in the determination of this matter.

**384**

Van Baalen Law Offices by Peter T. Van Baalen and Richard T. Weissman, Phoenix, for petitioners.

Jones, Skelton & Hochuli by Peter G. Kline, Bruce D. Crawford and Marc D. Blonstein, Phoenix, for real parties in interest.

## OPINION

NOYES, Presiding Judge.

In 1990, Patricia Ulibarri sued her former psychiatrist, Dr. Dean Gerstenberger, for medical malpractice, alleging that in 1983 and 1984 he hypnotized her and then subjected her to nonconsensual sexual relations. Gerstenberger answered that all sexual relations with Ulibarri were consensual, he filed a counterclaim accusing her of blackmailing him in 1986 by threatening to go public with their affair. Gerstenberger filed a motion for summary judgment, arguing that the complaint was time-barred because it was filed about six years after the alleged malpractice, and the applicable statute of limitations, Ariz.Rev.Stat.Ann. ("A.R.S.") section 12–542, is two years. In response to the motion, Ulibarri argued that the statute of limitations was tolled because Gerstenberger's post-hypnotic suggestions caused her to have no memory of their sexual relations until she was hypnotized by a gynecologist in 1989. The trial court granted summary judgment to Gerstenberger. Ulibarri appealed, and this court reversed and remanded, finding that Ulibarri had "raised a material fact issue as to whether she could have discovered the existence of her cause of action within the statutory time period." *Ulibarri v. Gerstenberger*, 178 Ariz. 151, 162, 871 P.2d 698, 709 (App.1993).

The case is back here on a pretrial special action. Ulibarri seeks relief from trial court discovery orders that overruled her invocation of the marital communications privilege regarding one communication and the attorney-client privilege regarding another. Each communication allegedly involved pre–1987 statements by Ulibarri about her sexual relations with Gerstenberger, thus impeaching her claim that Gerstenberger caused her to not "discover" those sexual relations until 1989.

 Special action jurisdiction is appropriate when no equally plain, speedy, and adequate remedy is available by appeal. *See* Ariz.R.P. Special Actions 1. Existence of a privilege is a question of law, and a special action is the appropriate means of relief when the trial court orders disclosure of information that a party believes is privileged. *Blazek v. Superior Court*, 177 Ariz. 535, 536, 869 P.2d 509, 510 (App.1994). We accepted jurisdiction and granted relief in part, finding a limited waiver of the attorney-client privilege and no waiver of the marital privilege, with this opinion to follow.

### Attorney–Client Privilege

Gerstenberger alleged that part of Ulibarri's blackmail efforts included her telling him in 1986 that she had consulted an attorney about their affair, and that the attorney had advised her to sue Gerstenberger. Ulibarri denied making these statements to Gerstenberger, and she invoked the attorney-client privilege to prevent his deposition of the attorney, J. Michael Flournoy. Gerstenberger filed a motion to depose Flournoy and the trial court found waiver of the privilege, granted the motion, and stayed the deposition pending resolution of this special action.

A.R.S. section 12–2234 provides, "In a civil action an attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment." The purpose of this privilege is to encourage a client to provide all information to the attorney so the attorney can provide effective legal representation to the client. *Granger v. Wisner*, 134 Ariz. 377, 379, 656 P.2d 1238, 1240 (1982).

The privilege protects *communication* between lawyer and client; "[i]t does not extend to facts which are not part of the communication between lawyer and client." *Id.* at 379–80, 656 P.2d at 1240–41. "Thus, the fact that a client has consulted an attorney, the identity of the client, and the dates and number of visits to the attorney are normally outside the scope and purpose of the privilege." *Id.* at 380, 656 P.2d at 1241.

 If Ulibarri consulted Flournoy as alleged, the above-mentioned facts would not be privileged, but any communications between them would be, unless the privilege has been waived. We find limited waiver here because a client waives the privilege by disclosing confidential communications to a third party, and Ulibarri allegedly did that by threatening Gerstenberger with those communications. *See* Morris K. Udall et al., *Law of Evidence* § 71 (3d ed.1991). A client also waives the privilege when her conduct places her in such a position with reference to the evidence that to permit retention of the privilege would be unfair and inconsistent. *Buffa v. Scott,* 147 Ariz. 140, 143, 708 P.2d 1331, 1334 (App.1985) (*citing* 8 John H. Wigmore, *Evidence* § 2388, at 855 (1961)). Ulibarri having allegedly threatened Gerstenberger with her attorney-client communications, and Ulibarri having denied those allegations, it is only fair that Gerstenberger be allowed to ask the attorney whether those alleged communications occurred. The privilege may not be used as both a sword and a shield. *Id.*

> [Claimant] is not permitted to thrust his lack of knowledge into the litigation as a foundation or condition necessary to sustain his claim against [defendant] while simultaneously retaining the lawyer-client privilege to frustrate proof of knowledge negating the very foundation or condition necessary to prevail on the claim asserted against [defendant]. Such tactic would repudiate the sword-shield maxim. . . .

*League v. Vanice,* 221 Neb. 34, 374 N.W.2d 849, 856 (1985); *Mountain States Tel. & Tel. Co. v. DiFede,* 780 P.2d 533, 544 (Colo.1989); *see Throop v. F.E. Young and Co.,* 94 Ariz. 146, 157–58, 382 P.2d 560, 567–68 (1963) ("The claim of privilege to buttress such a [seemingly false] position is contrary to the spirit of the privilege and the purpose of trials to ascertain the truth.").

In arguing that the privilege should be upheld, Ulibarri relies heavily on *Certainteed Corp. v. United Pacific Ins. Co.,* 158 Ariz. 273, 762 P.2d 560 (App.1988). There, plaintiff alleged that defendant was estopped by its own conduct from raising a statute of limitations defense. When defendant sought to discover communications between plaintiff and its attorney, the court upheld plaintiff's invocation of the attorney-client privilege, reasoning that communications between plaintiff and its attorneys "are not in issue. What is in issue is the conduct of [defendant]." *Id.* at 279, 762 P.2d 566.

Ulibarri argues that *Certainteed* is analogous because Gerstenberger's conduct in causing suppression of her memory of their sexual relations estops him from asserting the statute of limitations defense. We agree that the cases are analogous to that extent. But there are additional factors in this case which distinguish it from *Certainteed:* Ulibarri placed in issue her pre–1988 *memory* of Gerstenberger's conduct; she allegedly disclosed attorney-client communications reflecting her 1986 memory of that conduct; and she denied making that disclosure, thus placing in issue the existence of those attorney-client communications.

We hold that there has been a limited waiver of the attorney-client privilege regarding Ulibarri's 1986 alleged communications with Flournoy about her sexual relations with Gerstenberger. The content of any of this communication between Ulibarri and Flournoy is discoverable only to the extent that it concerns her 1986 memory of events for which she sued Gerstenberger in 1990. We do not dictate what questions can be asked of either Ulibarri or Flournoy, but our holding should be construed to permit the fewest and most narrowly-drawn questions as will provide necessary information regarding the specific issue on which waiver has been found. What we stated recently regarding a similar privilege applies to the attorney-client privilege as well: "The scope of an implied waiver of the psychologist-patient privilege is limited only to those com-

munications concerning the specific condition which petitioner has placed at issue." *Blazek*, 177 Ariz. at 542, 869 P.2d at 516.[1]

## Marital Communications Privilege

■ In 1994, Gerstenberger's investigator had a tape-recorded telephonic interview with Ulibarri's ex-husband, Michael. Michael had married Ulibarri in November 1984 and left her about ten months later. They did not stay in touch. After Gerstenberger's investigator assured Michael that he and Ulibarri were in fact divorced (in August 1985), Michael delighted the investigator with anecdotes and opinions about Ulibarri. One of the things Michael disclosed to the investigator, several times, was that Ulibarri had told him during their marriage that she had a sexual affair with Gerstenberger before their marriage. As the interview drew to a close the investigator said: "Mike, you've been wonderful, if you have any questions for me, give me a call, you've got my 800 number." Michael said: "Yea, well you've eased my mind. I thought maybe I was still married to her."

Gerstenberger's attorneys noticed Michael for a videotaped deposition in Phoenix. Ulibarri's attorneys, unaware of what was coming, agreed to the deposition and to pay half of Michael's travel expenses. When Ulibarri's attorneys asked to see a transcript of Michael's interview with the investigator, Gerstenberger's attorneys refused to disclose it, citing "work product protection." The day before the deposition, Ulibarri's attorneys had second thoughts about permitting the deposition and they filed a motion to preclude it, asserting the marital communications privilege (and some procedural grounds we do not discuss). The motion was denied and Michael was deposed. After the deposition, Gerstenberger's attorneys disclosed a transcript of Michael's interview—to rebut Ulibarri's claim that the investigator must have "put words in [Michael's] mouth." Ulibarri's attorneys filed a motion to preclude use of Michael's testimony at trial. The trial court denied the motion.

A.R.S. section 12–2232 provides, "A husband or wife shall not, during the marriage or afterward, without the consent of the other, be examined as to any communications made by one to the other during the marriage...." The statute lists four exceptions, none of which is relevant to this case. Gerstenberger claims that Ulibarri waived the privilege with regard to Michael when she placed in issue her memory of sexual relations with Gerstenberger. She has certainly placed her memory in issue, and that was significant to our finding a limited waiver of the attorney-client privilege. But we reach a different result regarding the marital communications privilege; and we think there are good reasons to explain why the marital communications privilege is upheld when, on similar facts, the attorney-client privilege is not.

■ The marital communications privilege is not "more important" than the attorney-client privilege; it is conceptually different. *See* 25 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5577, at 607 (1989). In expressing this difference, we find the following analysis helpful:

> Green and Nesson [E. Green & C. Nesson, *Problems, Cases and Materials on Evidence* (1983)] have classified privileges into two distinct types. The first is based on the professional counseling relationship between the holder of the privilege and the counselor for the purpose of fostering the effectiveness of the professional services; this category would include the lawyer-client, physician-patient, and priest-penitent privileges. The second category seeks to throw a veil of secrecy around certain areas of privacy in order to protect autonomy and dignity; the marital privilege and the privilege against self-incrimination fall into this latter group.

Brian Domb, Note, *I Shot the Sheriff, But Only My Analyst Knows: Shrinking the Psychotherapist–Patient Privilege,* 5 J.L. & Health 209 (1991).

**1.** "The confidential relations and communications between a client and a psychologist ... are placed on the same basis as those provided by law between an attorney and client." Ariz.Rev. Stat.Ann. § 32–2085.

■ The attorney-client privilege protects communications "for the purpose of fostering the effectiveness of the professional services[.]" Domb, *supra*. The attorney-client privilege is in the same category as other professional privileges such as the physician-patient, psychologist-patient, clergyman-penitent, and accountant-client privileges. *Id.; see* Ariz.Rev.Stat.Ann. §§ 12–2233, 12–2235, 32–749, 32–2085. The marital communications privilege "seeks to throw a veil of secrecy" over marital communications of any sort. The marital privilege protects any confidential communications made by one spouse to another in reliance on the marital relationship. *Delk v. Commonwealth of Kentucky*, 285 S.W.2d 169, 171 (Ct.App. 1955); *In re Vanderbilt*, 57 N.Y.2d 66, 453 N.Y.S.2d 662, 666, 439 N.E.2d 378, 382 (1982); *see Shepherd v. Indiana*, 257 Ind. 229, 277 N.E.2d 165, 167 (1971). The policy behind the marital communications privilege is to promote family harmony and to encourage spouses "to share their most closely guarded secrets and thoughts, thus adding an additional measure of intimacy and mutual support to the marriage." Udall, *supra*, § 73 (*quoting* G. Lilly, *An Introduction to the Law of Evidence* at 386 (2d ed.1987)). Because the fear of disclosure after death or divorce might prevent communications during marriage, this privilege survives the marriage. *Id.*

The marital communications privilege and the professional communications privileges are all created by statute, but professional communications have an additional source of protection—the ethical and disciplinary rules of the profession. *See* Domb, *supra*. For example, the Arizona Rules of Professional Conduct protect an attorney from having to disclose, and prohibit the attorney from disclosing, a client's confidential communications except in limited circumstances specified in the Rules; and the profession will discipline an attorney who violates the Rules. *See generally* ER 1.6 and 8.4, Ariz.R.Sup.Ct. 42. Because there is no corresponding set of ethical and disciplinary rules for the marital relationship, judicial enforcement of the marital communications privilege is all that protects a spouse from being compelled to testify about marital communications. *See* Wright & Graham, *supra*, § 5572, at 537; *In re Grand Jury Investigation*, 603 F.2d 786, 789 (9th Cir.1979) (witness "should not be compelled to choose among perjury, contempt, or disloyalty to a spouse."). Judicial enforcement of the marital communications privilege is also the only protection a spouse has to prevent an ex-spouse "who is more than willing to reveal pillow talk from doing so during the course of litigation." Wright & Graham, *supra*, § 5572, at 525, 538 ("One does not have to be very cynical to imagine that there are some cases in which the threat of exposure of marital secrets in discovery could plausibly be made as a settlement tactic.").

The conceptual differences between the marital communications privilege and the attorney-client privilege, and the vulnerability of the former in comparison to the latter, are evident in this case: Ulibarri need have no fear that Flournoy would violate his code of professional conduct and disclose their confidential communications in response, for example, to an inquiry from Gerstenberger's investigator, and this did not happen. The Flournoy–Ulibarri communications are at issue here only because Ulibarri herself allegedly disclosed them to Gerstenberger. Michael, on the other hand, is the sole source of disclosure concerning Ulibarri's marital communications to him. From the perspective of Gerstenberger's investigator, Michael was a "wonderful" witness who voluntarily disclosed much information, including marital communications that impeached Ulibarri.[2]

■ In arguing that we should not uphold Ulibarri's marital communications privilege, Gerstenberger relies on cases involving the anti-marital fact privilege.[3] These cases

---

**2.** Gerstenberger did nothing wrong in contacting Michael. Ulibarri listed Michael as a witness "whom the plaintiffs believe may have knowledge relevant to the events, transactions, or occurrences that give rise to the action." This listing was not an implied waiver of the marital communications privilege, however, because it

did not disclose any communications; it disclosed nothing other than Michael's name and an address of "unknown."

**3.** A.R.S. section 12–2231, the anti-marital fact statute, provides: "In a civil action a husband shall not be examined for or against his wife

must be distinguished: the anti-marital fact privilege deals with whether a spouse can take the witness stand; it does not necessarily deal with confidential communications, and it does not survive the marriage. Whether Michael can testify to facts is not the question; the question is whether he can testify over Ulibarri's objection to marital communications. We hold that he may not.

One jurisdiction has recently upheld the marital communications privilege in a tougher fact situation than we have here. In *Wadlington v. Sextet Mining Co.*, 878 S.W.2d 814 (Ky.Ct.App.1994), the appellant filed a workers' compensation claim for an allegedly work-related knee injury. When the employer deposed appellant's ex-wife, she disclosed marital communications from appellant to the effect that he was injured on vacation, not at work. The court concluded that the ex-wife's testimony regarding her observations of the knee was admissible, but what appellant said to her about the knee was not admissible because those communications occurred solely as a result of the marital relationship. *Id.* at 818.

Some cases have found a waiver of the marital communications privilege, but we find those cases distinguishable because the claims there involved the marital relationship, and Ulibarri's does not. *See United States v. Premises Known as 281 Syosset Woodbury Rd.*, 862 F.Supp. 847 (E.D.N.Y. 1994); *Prink v. Rockefeller Ctr., Inc.*, 48 N.Y.2d 309, 422 N.Y.S.2d 911, 398 N.E.2d 517 (1979); *Credit Bureau v. Smallen*, 114 Cal.App.2d Supp. 834, 249 P.2d 619 (1952). In *Syosset Woodbury*, the government sought forfeiture of real property allegedly purchased by claimant's husband with drug-trafficking proceeds. Claimant alleged that she was an innocent owner of the property and was unaware that her husband was a drug dealer. She invoked the marital communications privilege to some, but not all, questions about conversations she had with her husband about his employment. The

court found waiver on a number of grounds, including the fact that the wife's assertion of the innocent-owner defense put in issue all conversations with her husband relevant to his drug dealing. 862 F.Supp. at 855.

In *Prink*, plaintiff's husband fell to his death from the 36th floor of Rockefeller Center. There were no witnesses. Plaintiff sued the Center, claiming that her husband was trying to open the window and fell out because of negligent building design. The Center claimed that the husband was a depressed lawyer who jumped out the window. At deposition, plaintiff admitted that decedent had told her he was seeing a psychiatrist, but she invoked the privilege when asked to state the reasons he gave her for doing so. Finding that the lawsuit placed decedent's mental health in issue, the court ruled that he could not have hidden behind the marital privilege had he lived, so neither could his widow. 422 N.Y.S.2d at 916, 398 N.E.2d at 522.

*Smallen* has complicated facts involving an inter-family loan of money. The court found waiver of the marital communications privilege because "[t]he nature of the contract between the husband and wife and the wife's brother [was] the issue made by the complaint." 249 P.2d at 623.

The central claim in each of the above-referenced cases directly involved the claimant's spouse. Ulibarri's case does not: Michael has nothing to do with the events alleged in Ulibarri's complaint, or the events alleged in Gerstenberger's counterclaim. Ulibarri's malpractice claims arose before she married Michael, and Gerstenberger's blackmail counterclaim arose after she divorced Michael. Michael certainly offers relevant impeachment of Ulibarri's claim that Gerstenberger is estopped from raising a statute of limitations defense, but if "relevant impeachment" is enough to override the marital communications privilege, the privilege does not mean much, for it would be subject

without her consent, nor a wife for or against her husband without his consent. . . ." Although the marital communications privilege is based on the same rationale as the anti-marital fact privilege, the marital communications privilege has "very different contours." Udall, *supra*, § 73.

The dissent cites *United States v. Benford*, 457 F.Supp. 589 (E.D.Mich.1978), a criminal case that we distinguish because it, too, involves the testimonial (anti-marital fact) privilege rather than the marital communications privilege.

to disintegration whenever an ex-spouse agreed, for whatever reason, to "tell all" to the opposition.

■ Ultimately, it is a policy decision whether to find a privilege and whether to uphold it. Professor Wigmore stated that the following four conditions must be met before a privilege can be legally recognized: (1) the communications must originate in a confidence that they will not be disclosed; (2) this element of confidentiality must be essential to the full and satisfactory maintenance of the relationship; (3) the relationship must be one which, in the opinion of the community, ought to be sedulously fostered; and (4) the injury that disclosure would inure to the relationship is greater than the benefit thereby gained for the correct disposal of litigation. 8 John H. Wigmore, *Evidence* § 2285, at 527 (John T. McNaughton rev. 1961).

The fourth element is the one most seriously tested in this case: Ulibarri and Michael have no relationship at all, and Michael has evidence that would be relevant to the trier of fact's search for truth regarding Ulibarri's "suppressed memory" claim. We appreciate that upholding a privilege amounts to suppression of relevant evidence and that the cost of doing so is an increased risk of inconvenience and/or injustice in individual cases. Even so, on the facts in this case, we find the cost of denying the privilege far greater: erosion of public confidence in the marital privilege, erosion of public trust in the confidential nature of marital communications, exponential entanglement of domestic relations issues in third-party litigation. *See* Wigmore, *supra,* § 2332, at 643 (recognizing marital communications privilege because it so fully satisfies first three privilege conditions, and "compulsory disclosure of marital secrets at least might cast a cloud upon an essential aspect of the institution of marriage"). What strife and stress would be added to litigation if attorneys had an incentive to pursue opposing parties' spouses or ex-spouses in the hopes of discovering some impeaching marital communications. We remove that incentive by holding that it takes more than disclosure of "relevant impeachment" by a spouse or ex-spouse to override

the marital communications privilege held by the other party to that marriage.

In *Blazek,* we held that the marital communications privilege applies to communications made while a couple is separated pending divorce. 177 Ariz. at 540, 869 P.2d at 514; *see also In re Grand Jury Investigation of Hugle,* 754 F.2d 863, 865 (9th Cir.1985) (upholding marital communications privilege in estranged marriage). For the same reason, that privilege applies to divorced couples (regarding communications made to each other during the marriage): if the privilege were not upheld in such circumstances, "[m]arried partners could no longer be confident that their private revelations to each other would remain private. This uncertainty would defeat the policy behind the privilege." *Blazek,* 177 Ariz. at 540, 869 P.2d at 514. We also find persuasive this public policy discussion from the *Prink* dissent:

> The judgment of the Legislature, reflected in the codification of the privilege, expresses the long-standing social policy that the injury to domestic harmony and marital privacy occasioned by the unrestricted search for relevant information is too great to endure. Thus, the balance between potential unfairness to opposing litigants and preservation of the marital privilege has been struck in favor of the privilege—whether information is sought to establish a claim or to defend against it. While some may disagree with the wisdom of this choice, it is improper for a court to substitute its judgment for that of the Legislature.

422 N.Y.S.2d at 918, 398 N.E.2d at 524 (Cooke, C.J., dissenting) (citations omitted).

The marital relationship of Michael and Ulibarri did not endure, but society's respect for the institution of marriage does endure. Judicial protection of the confidentiality of marital communications is more important to society than allowing Ulibarri to be impeached with what she said to Michael about Gerstenberger.

### Conclusion

We hold that there has been no waiver of Ulibarri's marital communications privilege regarding Michael, and that there has been a

limited waiver of her attorney-client privilege regarding Judge Flournoy. Trial court orders to the contrary are vacated, and the matter is remanded for further necessary proceedings.

GRANT, J., concurs.

LANKFORD, Judge, dissenting in part.

I respectfully dissent from the holding that the marital communication privilege was not waived.

The majority argues that while the privilege for lawyer-client communications was waived, under the very same circumstances there was no waiver of the privilege for husband-wife communications. The majority's distinction between the two privileges is, in my view, unpersuasive.[4]

First, nothing in the Arizona statutes creating these evidentiary privileges suggests that the waiver rule should apply differently to the marital privilege, or indeed that the marital privilege is different in any material way from other evidentiary privileges. *See* A.R.S. § 12–2234 (attorney-client privilege); § 12–2232 (marital privilege); § 12–2233 (clergy-penitent privilege); § 12–2235 (physician-patient privilege). In fact, the language of these statutory privileges is substantially the same.

Nor have I found support in any Arizona judicial decisions for a hierarchy among privileges that supports the idea that facts justifying waiver of one privilege do not justify waiver of another privilege.

Nor do reasons of public policy require that we treat the privileges differently. With all respect, the majority's argument elevating the marital privilege to a special status, beyond the reach of the waiver rule, is unconvincing.

First, the majority argues that professional ethical rules provide additional protections of confidential attorney-client communications. While ethical rules do address confidentiality, the majority's argument does not show that the waiver rule should not apply to marital communications. Ethical rules do not require a lawyer to maintain confidentiality in the face of a court ruling that the privilege was waived and that the communication can be revealed. Consequently, the marital privilege is not more needy of judicial protection on the theory that no professional ethical rules apply.

Second, the majority analyzes the policy reasons for recognizing evidentiary privileges and concludes that the marital privilege should be upheld. But whether a marital privilege should be adopted is not the question here: the Arizona Legislature has settled that question by creating such a privilege by statute. The analysis the majority cites relates only to that question. See 8 John H. Wigmore, *Evidence* § 2285, at 527 (John T. McNaughton rev. 1961). Rather, the issue is whether an evidentiary privilege can be waived, and on that point there is universal agreement: marital and other privileges can be waived. As Wigmore says:

> The spouse possessing the privilege may of course *waive* it. The waiver may be found ... in some act of testimony which in fairness places the person in a position not to object consistently to disclosure ...

Wigmore, *supra* at § 2340, p. 671.

Waiver applies when the interest served by the privilege, protecting the privacy of the marital relation, must in fairness yield to the search for the truth. A litigant cannot be allowed to obtain money damages by advancing a falsehood under the cloak of privilege. As the majority states, "The privilege may not be used as both a sword and a shield." (Op. at 385, 909 P.2d at 452). On the other hand, it is difficult to conclude that sustaining the privilege here shields marital privacy in an important way because the underlying events occurred prior to the marriage and do not relate to the marriage.

The waiver arises in both the marital and the attorney-client communications in this case from the fact that by pursuing this

---

4. The majority finds waiver of the attorney-client privilege on two grounds. First, it says that a client waives the privilege when disclosing confidential communications to a third party. It also concludes that the conduct of the client "places her in such a position with reference to the evidence that to permit retention of the privilege would be unfair and inconsistent." (Op. at 385, 909 P.2d at 452). The latter is the same ground on which a waiver of the marital privilege also rests.

action Ulibarri has placed her knowledge in issue. Whether the marital privilege is waived should be decided by the same standard the majority applies to the attorney-client privilege: "[Ulibarri] has certainly placed her memory in issue, and that was significant to our finding a limited waiver of the attorney-client privilege." (Op. at 386, 909 P.2d at 453). The same analysis applies to physician-patient communications. When a plaintiff brings an action for personal injuries, the plaintiff impliedly waives the physician-patient privilege with respect to matters relating to the injuries. *See Throop v. F.E. Young & Co.*, 94 Ariz. 146, 382 P.2d 560 (1963); *Bain v. Superior Court*, 148 Ariz. 331, 714 P.2d 824 (1986) (applying implied waiver to physician-patient and psychologist-patient privileges on ground that privilege cannot be used to unfairly place a claimant in a position to assert a claim contrary to the evidence).

Indeed, I find it anomalous that the majority applies waiver to the attorney-client communications, but not to the marital communications. Professor McCormick has argued that the marital privilege serves a different, lesser goal than other privileges and therefore that the privilege should be applied sparingly. McCormick argues that while the marital privilege protects privacy, it does not encourage marital communications. "What encourages [the parties] to fullest frankness is not the assurance of courtroom privilege, but the trust they place in the loyalty and discretion of each other." *McCormick on Evidence* § 86, p. 309 (4th ed.1992). McCormick argues for the narrowing or elimination of the marital privilege:

> [W]hile the danger of injustice from suppression of relevant proof is clear and certain, the probable benefits of the rule of privilege in encouraging marital confidences and wedded harmony is at best doubtful and marginal. . . .

> [D]elicacy and decorum, while worthy and deserving of protection, will not stand in the balance where there is a need for otherwise unobtainable evidence critical to the ascertainment of significant legal rights. This disproportion, together with the consideration that maintenance of privacy as a general objective is not critically impaired by its sacrifice in cases of particular need, argues for treating this privilege as a qualified one. . . .

> [I]t may someday be recognized that a communications privilege, however appropriate to professional relationships, is highly unsuited to the marital context. . . .

*Id.* at p. 310–11. In contrast to the marital privilege, professional communications privileges do encourage communication. For example, the client is often expressly, indeed acutely, aware that his lawyer may not reveal the client's confidences and is thereby encouraged to communicate frankly and fully with the lawyer. Thus, I find no persuasive basis for distinguishing testimonial privileges so that the marital privilege is exempt from waiver while other privileges are not.

The majority opinion cites but a single case for its view that no waiver occurs in these circumstances. However, I find *Wadlington v. Sextet Mining Co.*, 878 S.W.2d 814 (Ky.App.1994) unpersuasive. In that case, implied waiver by bringing a lawsuit was not even an issue. Rather, the question was whether the scope of the marital communications privilege extended to a former spouse's knowledge gained by simple observation— which of course, it does not. As a result, the court allowed the former spouse to testify to her observations of an injury, but marital communications were not allowed in evidence.

On the other hand, several courts have held that a marital privilege is waived when the spouse affirmatively places in issue the subject matter of the communication. For example, *Prink v. Rockefeller Center, Inc.*, 48 N.Y.2d 309, 422 N.Y.S.2d 911, 398 N.E.2d 517 (1979) held that a wrongful death plaintiff could not withhold communications to her by the deceased spouse revealing his mental state when the issue was whether death was by accident or by suicide. After quoting Professor McCormick that the purpose of the privilege is to protect marital privacy, the court said:

> Bearing in mind the purpose for which the privileges in question were created . . . , the affirmative stance of plaintiff who

claims ... to have sustained pecuniary injury as a result of defendants' negligence, and the unfairness of permitting plaintiff to succeed by hiding behind the privileges asserted, we are satisfied on balance that the better policy is to hold the privileges waived....

To hold otherwise is to ignore the realities of the factual situation and to come perilously close to a taking of defendants' property without due process of law.

422 N.Y.S.2d at 916, 398 N.E.2d at 522.

*United States v. Premises Known as 281 Syosset Woodbury Road,* 862 F.Supp. 847 (E.D.N.Y.1994) was a civil forfeiture action in which the court held the privilege unavailing. The spouse asserted an "innocent owner" defense which place in issue her knowledge of her husband's drug transactions. A magistrate's order applying the privilege was reversed as "clearly erroneous and contrary to law." 862 F.Supp. at 855.

With all respect, the majority's distinction of *Prink* and *Syosset* as directly involving the marital relationship while in the present case the marital relation was unrelated to the lawsuit is unpersuasive. The plaintiffs in those cases and here placed in issue a matter on which privileged communications cast essential light. Permitting the privilege to be invoked would be "far more likely to frustrate justice than to foster family peace." *Trammel v. United States,* 445 U.S. 40, 52, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). This is the controlling question in a waiver case, not whether or not the claim in the lawsuit directly involved the spouse.

The privilege applies to all confidential marital communications, whether about the marriage or not and the waiver question is the same whether the communications are concerned with the marriage itself or not.

In *United States v. Benford,* 457 F.Supp. 589 (E.D.Mich.1978), the court held the privilege waived in a criminal case. The defendant husband proposed to give testimony suggesting that guns found in his residence were not his. The government sought the wife's testimony. The court held the privilege would be waived if the husband were to testify as planned, explaining:

The facts indicate that the wife is in a unique position to confirm or contradict the defendant's claims. If the jury is not permitted to hear the wife's version of the facts, they may be misled into believing that no such testimony exists....

[T]estimonial privileges, by their very nature, keep relevant and probative evidence from the jury. Because of this, their exercise should be limited to those situations in which the sought after benefit to the privileged party legitimately outweighs the cost to society in terms of judicial inefficiency....

[W]hen the defendant attempted to take advantage of his wife's forced silence by testifying to things known only to himself and to her, he attempted to use the privilege for a purpose it was never meant to cover.

457 F.Supp. at 597.

All of these cases found waiver. The decisions of other courts are consistent with the basic principle that evidentiary privileges are strictly construed because they are in derogation of the truth. This view was expressed by the United States Supreme Court in narrowing the marital privilege in *Trammel v. United States,* 445 U.S. at 50, 100 S.Ct. at 912:

Testimonial exclusionary rules and privileges contravene the fundamental principle that " 'the public ... has a right to every man's evidence.' " ... As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."

Accordingly, I would not grant extraordinary relief from the trial court's decision that the lawyer-client and marital privileges do not apply.